317 So.2d 517

**Walter Bernard ALLEN, Jr., alias**

**v.**

**STATE.**

**6 Div. 726.**

Court of Criminal Appeals of Alabama.
June 17, 1975.

William J. Baxley, Atty. Gen., Montgomery, David L. Weathers, Asst. Atty. Gen., Birmingham, for the State.

William T. Kominos, Birmingham, for appellant.

BOOKOUT, Judge.

First degree murder: sentence, life imprisonment.

After appellant's arraignment on an indictment for first degree murder, he applied for treatment as a youthful offender pursuant to Act No. 335, Acts of Alabama 1971, 3rd Spec. Session, approved February 10, 1972. The trial court, after a hearing, denied treatment as a youthful offender. On appeal, we found that the judgment en-

try failed to reflect whether an investigation had been made by a probation officer, and we remanded with directions on May 6, 1975, on authority of *Morgan v. State,* 291 Ala. 764, 287 So.2d 914; *Tarver v. State,* 1975, 55 Ala.App. ——, —— So.2d ——; and *Edwards v. State,* 1974, 55 Ala. App. 544, 317 So.2d 511.

On May 12, 1975, the trial court filed a supplemental transcript in answer to our order on remandment, making a showing that a probation report was in fact made and inadvertently omitted from the original transcript of the record on appeal. The full report of the probation officer is set out in the supplemental transcript of the record, and this Court will now review the case on its merits.

■ It should be noted, however, that since the answer to the remandment, the Alabama Supreme Court has modified the effect of *Morgan,* supra, by holding that referral to a probation officer is no longer mandatory. The trial courts may now make or order such investigation as they deem necessary and then hold an examination and then make a determination whether or not to accord youthful offenders treatment to an accused. *Clemmons v. State,* 1975, 294 Ala. ——, 321 So.2d 238.

On August 6, 1973, Walter Bernard Allen, Jr., and three companions, Ronald Allison, Willie Jones and Adrian McCall, were driving on Highway 280 approaching the interchange ramp at Highway 31 in Mountain Brook, Jefferson County, Alabama. The appellant was driving a Cadillac which belonged to his employer which he apparently took without permission. He was stopped by Officer Fred Harp of the Mountain Brook Police Department. Officer Harp, upon discovering that the appellant did not have a driver's license, ordered him out of the car where he was then searched and handcuffed with his hands behind him. As Sergeant Harp reached into the car, apparently to remove the keys from the ignition, the appellant grabbed the officer's pistol from his holster.

From here on, the facts are somewhat in dispute as to what exactly happened. However, the appellant, while still handcuffed, somehow fired a shot which sent Sergeant Harp down wounded. After this, the appellant asked the Sergeant for the keys to the handcuffs, and Sergeant Harp stated that they were in the police car. Appellant stated that he only fired one shot and that he gave the pistol to Ronald Allison and then went back to the police car in order to get the keys to the handcuffs, but was unable to find them. The appellant said he then heard another shot. After this, all of the occupants of the car ran across the highway and fled the scene.

The State's evidence presented at trial showed that the death of Officer Harp was caused by a bullet or bullets from his own pistol. His revolver was found by the police in a home near where the appellant was taken into custody. The State called some twenty-one witnesses. The defense called two witnesses, one of which was the appellant himself.

Charles G. Robey testified that he was Deputy Coroner of Jefferson County. His testimony was that he received a call on August 6, 1973, at 11:45 P.M. to the University Hospital. He arrived there at 12:15 A.M. on August 7, 1973. He viewed the deceased, Fred Harp, and stated that he was dead. He also testified that he and Dr. Willis Crawford were together that morning at Mercy Hospital in the morgue and autopsy room and that he was given a bullet by Dr. Crawford along with a blood sample and some tissue of the body. Mr. Robey stated that he received another bullet from a Dr. Carraway at the University Hospital.

Dr. Willis B. Crawford, a pathologist, testified that he had performed the autopsy on the deceased, Fred Harp. Dr. Crawford testified as to the wounds on the body. He used diagrams and photographs to illustrate his testimony. Dr. Crawford further testified that possibly three bullets could have entered the body and that a bul-

let designated on his diagram as bullet # 1 was the cause of death.

Patrolman Hocutt testified that he was the radio dispatcher for the Mountain Brook Police Department, and that he had been in communication with the deceased just before the shooting. He further testified that the deceased called in to check the license number of the Cadillac which the appellant was driving at the time of the incident. Patrolman Hocutt stated also that he had no further contact with the deceased, but some other person using Officer Harp's radio called to report that an officer had been shot, and Hocutt called for an ambulance.

The State put on numerous witnesses who had happened along the ramp at the Red Mountain Expressway immediately after the incident and one witness who came by possibly just before the shooting.

Much of the State's presentation of evidence involved the testimony of various law enforcement officers who arrived at the scene or those who took part in the investigation of the murder. The appellant's attorney sought to show that the appellant was severely beaten by the arresting officers.

The State called as a witness, Adrian McCall, a rider in the back seat of the car which the appellant was driving on the night of the fatal shooting. Adrian McCall stated that when he heard the shot, he looked around and saw the appellant "jumping back." He further stated that after the shot, he and the others jumped out of the car and ran. The record shows that Adrian McCall was the cousin of Ronald Allison who was also indicted for the murder. On cross examination, Adrian McCall testified that three shots were fired. The witness stated that he heard one shot, a pause, and then heard two more shots right after each other.

The next witness called was Willie Jones, a rider in the back seat of the Cadillac on the night of the shooting. His tes-timony closely paralleled that of Adrian McCall's in that neither one of them actually saw Ronald Allison fire any shots. Willie Jones demonstrated for the jury the way the appellant moved his handcuffed hands to his side in order to reach and get the policeman's gun from his holster. On cross examination, the witness testified that he did see the gun "jerk" while in the hands of Ronald Allison.

The next few witnesses had to do with the arrest of the appellant at 2102 Henrietta Road. Officer Thomas C. Green and Officer Tommie Evans were the first to arrive at the scene of the arrest. Sergeant Higgins, Commanding Officer of Scientific Investigation, Birmingham Police Department, testified that he took into his possession a revolver found in the closet at 2102 Henrietta Road and that three of the cartridges had been spent. He test fired six cartridges, and turned the bullets over to the State Toxicologist. Sergeant Watkins of the Mountain Brook Police Department made positive identification of the handcuffs belonging to the deceased, Fred Harp, that had been used on the appellant. Don Knight testified to the purchase of and identified the revolver owned by the deceased, Fred Harp.

The State called as its witness Dr. Robert B. Johnson, Toxicologist in charge of the Birmingham Division, who testified to receiving two spent bullets and the six test-fired bullets from the murder weapon. Dr. Johnson stated, ". . . they all had six land and grooves with a left hand twist; that is left right . . . ." After viewing them, Dr. Johnson microscopically identified them as having been fired from the same gun.

The defense called the appellant as its first witness. As to the shooting, his testimony appears as follows:

"Q. All right, now, put your hands behind your back like you were handcuffed that night. If I represent the policeman, what if anything, did you do with your hands handcuffed behind your back?

"A. I 'retch' like this for his pistol.

"THE COURT: Talk louder, please.

"A. I 'retch' for his pistol like this.

"Q. Did you reach for it in his holster?

"A. Yes, sir.

"Q. And he was bending over in the car?

"A. Yes, sir.

"Q. And did you pull the pistol out?

"A. Yes, sir, as I was pulling it out he felt it, started coming out of the car. He came on out and turned and grabbed for it.

"Q. He grabbed for the gun?

"A. Yes, sir.

"Q. And then what happened, Walter?

"A. It went off."

The defense called as its second and last witness, Linda Robinson who lived at 2104 Henrietta Road, next door to where the appellant was arrested. She testified as to the arrest of the appellant. In her testimony, she stated that the appellant was beaten by some of the policemen. Rebuttal witnesses called by the State denied the beating of the appellant. Witnesses at the police station where appellant was brought after the arrest denied that he appeared to have been beaten as was indicated in his testimony.

I

We find no merit whatsoever in the appellant's argument that the State failed to make a prima facie case under the indictment. The facts and evidence hereinabove set out clearly establishes the death of Officer Harp, the means and cause of death, and the shooting of the deceased by the appellant. From the witness stand, from the appellant's own lips, comes a clear description of how he took the victim's gun and shot him. Whether he or others present fired other shots into the wounded officer are questions for the determination of the jury. Likewise, where the officer was shot three times, under the circumstances of the evidence presented, the jury had ample ground to determine it was the appellant who fired the fatal shot. The trial judge did not err in submitting the case to the jury and in denying the appellant's motion to exclude the State's evidence. See: *McDowell v. State,* 238 Ala. 101, 189 So. 183 (1939); *Payne v. State,* 48 Ala.App. 401, 265 So.2d 185, cert. denied 288 Ala. 748, 265 So.2d 192, cert. denied 409 U.S. 1079, 93 S.Ct. 703, 34 L.Ed. 2d 669 (1972); *Price v. State,* 52 Ala.App. 21, 288 So.2d 803 (1974).

II

Counsel for the appellant argues that the trial court erroneously admitted into evidence State's Exhibit 3, which was a photograph of the body of the deceased showing bullet wounds. The grounds for objection were that the photograph was repetitious of the first photograph that the State had introduced into evidence, that it was cumulative and of no further probative value in the case. The trial court overruled, and Dr. Crawford, who performed the autopsy, testified concerning the wounds depicted in that photograph, using it to illustrate his testimony.

Later, on cross examination, counsel for the appellant questioned the physician concerning State's Exhibit 3. Defense counsel then objected to that exhibit because it showed an incision made during the autopsy and that the body was not in the same condition in the photograph as it was when it was first brought to the hospital. Counsel asked that the court remove the exhibit from evidence and after argument out of the presence of the jury, the court overruled the objection and allowed the photograph to remain in evidence.

In a similar case, this Court approved the introduction of a photograph showing both surgical incisions and stab wounds. Judge Tyson in *Means v. State,* 51 Ala. App. 8, 282 So.2d 356 (1973), in approving the use of such photograph, quoted from *McKee v. State,* 253 Ala. 235, 44 So.2d 781 (1950):

" '. . . There was no error in admitting in evidence a photograph of the deceased, taken after the performance of an autopsy, even though the photograph showed marks of incisions made for the purposes of the autopsy, the autopsy surgeon pointing out to the jury the marks resulting from his examination.' . . ."

In the instant case, Dr. Crawford, the pathologist who performed the autopsy, pointed out to the jury the fact that incisions were made for the purpose of the autopsy. Likewise, the trial judge instructed the jury concerning State's Exhibit 3 that ". . . the only thing which you are to consider within this photograph, is the wound as described by Dr. Crawford and nothing else."

■ The appellant's first ground for objection, that the photograph was similar to another already in evidence and, therefore, cumulative, is insufficient. In *Cook v. State,* 52 Ala.App. 159, 290 So.2d 228 (1974), Judge Harris, speaking for this Court, stated:

"The fact that such evidence is cumulative does not affect its admissibility so long as it sheds light upon a material inquiry, illustrates the transaction at issue, or tends to elucidate the material facts under inquiry, and has a tendency to illustrate the severity of the assault. *Swindle v. State,* 27 Ala.App. 549, 176 So. 372; *Wilson v. State,* 31 Ala.App. 21, 11 So.2d 563; *Reedy v. State,* 246 Ala. 363, 20 So.2d 528; *Grissett v. State,* 241 Ala. 343, 2 So.2d 399."

## III

■ During the appellant's cross examination of Adrian McCall, an occupant in the Cadillac at the time of the shooting, the following occurred:

"Q. Ronald Allison is your cousin, isn't he?

"A. Yes, he is.

"Q. Would you do or say anything to protect Ronald Allison?

"MR. BROWN: I object to the form of the question.

"THE COURT: Sustained."

Earlier, at the beginning of the State's direct examination of the witness, he was asked if he was related to Ronald Allison. He stated that he and Ronald Allison were cousins, that their mothers were sisters. The fact of the witness's relationship with Allison was clearly put before the jury by both the State and the defense, and his testimony could be given such weight and credibility by the jury as that relationship might suggest.

The appellant, however, contends that the court erred in sustaining the State's objection to the question propounded to the witness on cross examination of whether he would do or say anything to protect his cousin, who the record shows was also charged with murder arising from the same shooting incident.

The State relies upon the case of *Maples v. State,* 44 Ala.App. 491, 214 So.2d 700 (1968), which held in part as follows:

". . . It is always permissible to cross examine a witness to ascertain his interest, bias, prejudice or partiality concerning matters about which he is testifying. The proper way to show bias on the part of the witness is to ask him directly the state of his feelings, and if he denies bias, then resort may be had to facts tending to show it. *Nichols v.*

*State,* 276 Ala. 209, 160 So.2d 619; *Meador v. State,* 37 Ala.App. 573, 72 So.2d 418."

The *Meador* case, cited in *Maples,* supra, held:

"The proper way to show bias on the part of a witness is to ask him directly the state of his feelings, and if he denies bias, then resort may be had to facts tending to show it. . . ."

We are not unmindful of *Nichols v. State,* likewise cited in *Maples,* supra, wherein Justice Merrill acknowledged the general rule in this regard set out in *Meador,* supra, but pointed out that it is not required in every case as a condition precedent to showing bias of a witness during cross examination, that the witness must first be asked about the state of his feelings.

Justice Merrill set out several examples of questions not so predicated which had been held proper. We do not find the questions asked on cross examination in the instant case to be sufficiently similar to the examples which Justice Merrill sets out, so as to qualify it as an exception to the general rule set forth in *Maples,* supra.

The Supreme Court of Alabama has likewise held that although the statutory right to a thorough and sifting cross examination belongs to every party, the extent of cross examination is a matter addressed to the sound discretion of the trial judge, which is not reviewable except for abuse. *Bridges v. State,* 284 Ala. 412, 225 So.2d 821 (1969); *Seals v. State,* 282 Ala. 586, 213 So.2d 645 (1968). Where the State had previously brought to the attention of the jury the fact that the witness against the appellant was a cousin of another defendant charged in the same shooting, and where the same fact was again brought to the attention of the jury by the appellant's

counsel, the possibility of bias arising out of such kinship was squarely before the jury for their consideration. Therefore, the additional question to the witness as to whether he would "do or say anything" to protect his cousin could properly be sustained by the trial judge without abusing his discretion.

 Additionally, we are of the opinion that the form of the question was improper as calling for a conclusion or a speculative opinion on the part of the witness as to what he would do to protect his cousin. As a general rule, questions posed to witnesses must be in such form to elicit facts. Witnesses, certainly non-expert witnesses, must testify to facts, not conclusions, inferences or opinions. See Alabama Digest, Criminal Law, Section 448 and Evidence, Section 470, et seq.

The Attorney General, in his brief, on this point stated:

". . . The prosecutor made an objection to the form of the question which was sustained. This question clearly went beyond the scope of proper cross-examination. How could a witness be expected to say whether or not he would do 'anything' to protect someone else. This was not a question designed to show bias on the part of the witness. Rather, it was a nebulous catch-all designed to confuse the witness and prejudice the jury against his story. For that reason, the objection to it was properly sustained."

We agree.

Affirmed.

TYSON, HARRIS and DeCARLO, JJ., concur.

CATES, P. J., not sitting.