Wilson Gilmore, the appellant, was indicted by the Grand Jury of Jefferson County in November of 1974 and charged with the first degree murder of Willie Moody by pushing him down a flight of stairs. A petit jury found the appellant guilty of manslaughter in the first degree and fixed his punishment at five years imprisonment in the penitentiary. Accordingly the trial court entered judgment and sentence. Gilmore, an indigent, is represented by court appointed counsel both at trial and on appeal.
On appeal, Gilmore contends that his conviction is due to be reversed for two reasons: (1) Because of the admission of photographs of the deceased and (2) because the state failed to prove the cause of death.
The testimony presented by the state tended to show that on the evening of May 20, 1974, Willie Moody, age 39, and his sister, Mary Johnson, went to the rooming house where Gilmore, age 61, was staying to pick up some clothing that his sister had left in the apartment. The apartment belonged to a Leroy Collins and was located on the second floor of an apartment *Page 1195 
building. Mary Johnson entered the apartment to get her clothing. As Willie Moody, alias "Green Honey" arrived at the front door, Gilmore asked Moody what he was doing coming to the house. Moody replied that he came after fifty cents. According to eyewitness testimony, Gilmore then grabbed Moody and threw him over the second story banister. Moody hit the concrete below and never regained consciousness. He died on August 14, 1974, approximately three months after this injury was sustained. Evidence was adduced that Gilmore told the deceased he would kill him and stated, after he shoved Moody to his death, that he did not care if he did kill him. Immediately after this incident, Gilmore fled the scene of the crime.
The appellant, Gilmore, presented evidence that Mary Johnson had been living with him at Collins' apartment. On the day of the killing, Gilmore learned that Ms. Johnson had spent the day with another man. When she returned that evening with her brother (the deceased) and another man, Gilmore asked them to leave because Collins was sick. As he opened the screen door, Moody stepped up and hit Gilmore in the head knocking his glasses off. A fight ensued. Gilmore testified that the deceased cursed him and continued the assault. As Moody swung at the appellant, Gilmore ducked and Moody went over him and over the stair rail.
 I
The state introduced three photographs which were taken of the deceased at the time of his death which occurred approximately three months after his injuries were received. During this period the deceased underwent two surgical operations to his head. Initially the trial court allowed the photographs in evidence over the objections of the appellant. However, following the close of the evidence, the court granted the appellant's motion to exclude the pictures,
 "for the reason that there had been an operation earlier, scars from an earlier date on there. So, for that reason I'm excluding these pictures, because I don't feel they have probative value."
The trial judge determined that the pictures were not "passed around" to the jury although one juror admitted that he could see them.
The appellant contends that the admission of the photographs into evidence was error because they depicted a substantial change in the condition of the deceased from his condition at the time of his injury. These photographs were not made a part of the record on appeal.
The three photographs were made by a deputy coroner approximately three months after the fatal injuries were received. Apparently these photographs depict scars resulting from two separate operations on the head of the deceased necessitated by the injuries he received at the hands of the appellant. In addition to these operations, the deceased also received a tracheotomy and another minor operation in which a tube was inserted in his abdomen for feeding purposes. The head of the deceased was partially shaved and revealed evidence of pressure ulcers or "bedsores".
The basis of the objection of the appellant to the photographs is that they depict several scars and incisions on the body of the deceased which were the result of operations and were not a depiction of just those injuries he received in the fall.
The Deputy Coroner who made the pictures testified that he examined the body of the deceased and noted that the deceased,
 "had two old scars on the bottom part of his body in the abdomen area; had an old scar on his left leg; had an old scar on the right side of his head; and had an abrasion-type wound on the left side of his head."
The head of the deceased had been shaved during his stay in the hospital. The coroner stated that these were the only marks on the head of the deceased.
On May 20, 1974, the day the appellant was injured, he was admitted to the University Hospital in Birmingham. He remained there for two months before he was *Page 1196 
transferred to Mercy Hospital on July 18th where he came under the care and supervision of Dr. John Bazley. The transfer was necessary because after his injury, the deceased had developed a problem of infection, a brain infection, and chronic aspiration pneumonia.
Dr. Bazley testified that the deceased underwent two major operations while at University Hospital. He had obtained a medical history of the deceased "from the doctors taking care of him and their records when he was at the University."
He identified on the photograph of the deceased the cranial area that was operated on and pointed out the area of the head on which the operations had been performed. He also pointed out the area where the deceased had developed abscess and a pressure ulcer or "bedsore". He identified the scar on the deceased which was caused by a tracheotomy. He could not identify a mark or scar across the right temple of the deceased as being caused by an operation or as being a previous scar from "another day or year" or whether it "was related to this illness or another illness".
The general rule in Alabama is that photographs of a murder victim taken after the performance of surgery or an autopsy are admissible in evidence even though they show the marks of incisions made for the purpose of the autopsy or resulting from the surgery where these marks are sufficiently identified and pointed out to the jury. McKee v. State, 33 Ala. App. 171,31 So.2d 656, cert. denied, 249 Ala. 433, 31 So.2d 662 (1947);Gaddis v. State, 39 Ala. App. 630, 106 So.2d 268 (1958);Kilpatrick v. State, 46 Ala. App. 290, 241 So.2d 132 (1970);Means v. State, 51 Ala. App. 8, 282 So.2d 356, cert. denied,291 Ala. 792, 282 So.2d 359 (1973); Hurst v. State, 54 Ala. App. 254, 307 So.2d 62 (1974); Allen v. State, 55 Ala. App. 549,317 So.2d 517 (1975). While Dr. Bazley could not identify the cause of each and every scar or mark on the head and body of the deceased, he was able to specifically identify what portions of the head were operated on and where the injury to the head occurred. This was a sufficient identification under the circumstances of this case to satisfy the rule set forth above.
We disagree with the finding of the trial court that the photographs were of no probative value as they tended to show the nature and location of the fatal wound. The fact that a photograph has very little probative value does not prevent its admissibility where it will tend to shed light on, strengthen, or illustrate the truth of other testimony; or where it has a reasonable tendency to prove or disprove some material fact or issue in the case; or where it illustrates the location, nature or extent of the wound or is used to identify the deceased.Lewis v. State, Ala.Cr.App., 339 So.2d 1035, cert. denied, Ala., 339 So.2d 1038 (1976); Robinson v. State, Ala.Cr.App.,342 So.2d 1331 (1977).
Additionally there was no error in originally allowing the pictures in evidence because of the action of the trial judge in withdrawing the photographs from evidence before the jury began its deliberation and before they were passed around to the jury. As we have already determined that the photographs were, in fact, relevant and admissible, though of little probative value, there was no error in their original admittance because they were subsequently withdrawn from evidence despite the fact that one juror stated that he could see the picture and no instructions were given by the trial judge directing the jury to disregard and not consider the photographs. We therefore distinguish this case from Patrick v.State, 43 Ala. App. 338, 190 So.2d 551 (1966) where it was held that any error in the admission of a photograph of a stab wound which was taken after the wound was altered by surgery was cured by the court's withdrawal of the photograph from evidence and an instruction to the jury not to consider it.
In holding that the admission and subsequent withdrawal from evidence of the photographs were not reversible error we especially note that no photograph could be more descriptive, graphic, or revealing of the injuries suffered by the deceased in *Page 1197 
terms of prejudice or damaging testimony to the appellant than the testimony of that witness for the state who stated that when the head of the deceased hit the concrete, it "popped like a balloon".
 II
The second and final argument of the appellant is that the state failed to prove the cause of death. The matter of proof was complicated by the fact that Moody lived for approximately three months following his fall.
An eyewitness testified that when the head of the deceased hit the concrete it "popped like a balloon". Following his fall, Moody never regained consciousness. Expert testimony by the attending physician revealed that he sustained a severe head injury, developed pneumonia and a brain infection and died. In particular we note the following testimony:
 "Q. In your medical opinion, what was the cause of his death?
 "A. I think it was a combination of the extensive destruction of the brain with superinposed infection in the area of the brain that was destroyed; lung infection, secondary to the prolonged unresponsive state of coma.
 "Q. And in your opinion as his doctor and as an expert, was that infection caused by the trauma to his head?
"A. Yes.
"Q. The injury to his head?
"A. Yes."
This expert also testified that it was his opinion that the initial injury to the brain was the cause of complications which ultimately caused death.
With this testimony, the causal connection between the injury inflicted and the cause of death was not left to doubt or speculation. A physician who attended the deceased may testify as to the cause of death. Simon v. State, 108 Ala. 27,18 So. 731 (1895); Diamond v. State, 219 Ala. 674, 123 So. 55 (1929); See 6 Alabama Digest, Criminal Law, 476.
We have reviewed the entire record carefully and as required by law. Finding no error we are of the opinion that the judgment of the trial court is due to be and is hereby
AFFIRMED.
All Judges concur.
 *Page 268