290 So.2d 228

**Marshall COOK, alias,**

**v.**

**STATE.**

**5 Div. 194.**

Court of Criminal Appeals of Alabama.

Jan. 29, 1974.

Rehearing Denied Feb. 12, 1974.

Walker, Hill, Gullage, Adams & Umbach, Opelika, for appellant.

William J. Baxley, Atty. Gen., for the State.

HARRIS, Judge.

Cook was indicted for murder in the first degree involving the death of William Lee Jackson. He was convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for a term of twenty years. At arraignment, attended by counsel of his choice, he interposed a plea of not guilty. Trial counsel also represents him on appeal. He is free on bond pending appeal.

On March 12, 1973, the deceased was shot twice with a .22 caliber rifle. The shooting took place in the home of Johnnie Lee Haggard, a woman, with whom the deceased had been living for about three years. There is no claim that they were married or had ever held themselves out to the public as husband and wife. It is not disputed that the deceased died as a direct result of the shooting. Appellant claimed the shooting was in self-defense and also

in defense of his wife. It is not disputed that the deceased was armed with a hatchet or chop axe, and that appellant and his wife were cut during the melee that ensued and at the time of the shooting. Appellant's wife and Johnnie Lee Haggard were sisters. Mr. and Mrs. Cook lived in a trailer court located on property belonging to Johnnie Lee Haggard and a short distance from her home. The Cooks lived in the trailer court free of rent. The deceased was a free boarder in the Haggard home.

All witnesses present at the time of the fatal shooting had been drinking intoxicating liquors in one form or another during the day of the homicide and probably the day before. According to the testimony of Johnnie Lee Haggard, the deceased had been drinking whiskey the day of the homicide as well as the day before. Two pint bottles of whiskey were observed by the police officer who was dispatched to investigate the shooting. These pint bottles were half empty and were in the living room where he found the deceased lying on the floor. At that time, Willie Lee Jackson (the deceased) was still alive but did not make a statement. He died shortly after he was carried to a local hospital.

The police officer interrogated appellant at the scene of the homicide. He was placed under arrest and carried to the hospital for treatment of the cuts and lacerations inflicted upon him by the deceased with the chop axe. He was then carried to the station house where he was given the *Miranda Warnings*. Appellant signed a "waiver of rights" and made the following statement:

"Mr. Marshall Cook stated; That the day before that he and his wife and her first cousin had returned from Florida, About 2:30 A.M. that morning and we went to bed and sleep (sic) until about 10: A.N. (sic) that morning. We got up and I made a salad and my wife (Sallie M. Cook) called her sister Johnnie Lee Haggard to come down to the trailor

(sic) and get some of the fruit and vegetables and some of the salad which I had made. Which Johnnie Lee Haggard did come on down. She stayed about 30 minutes then she left and carried fruit and vegetable and the first cousin carried the salad. (Lela Cotney) When they arrived at Johnnie Lee Haggard's House 2002 43rd St. and when they arrived there Willie Lee Jackson meet them at the door with a hammer, in his hand, he broke the salad bowl of salad. Then he threw the hammer at the cousin and called her a bitch. She came back to our trailor (sic) after that my wife tried to called up there. He answered and refused to let her talk to her sister and my wife went up there. He got after her with a hatchet. She left and come back home. We stayed at home the rest of the day and night. This morning 3/12/73, I, Marshall Cook tried to call up there to see see (sic) how my sister in law was. He refused to let me talk to her. Then my wife called two times, he refused to let her talke (sic) to her— The (sic) my wife said that she was going up there and I told her she would not go unless I was with her.

Then I got my rifle (.22 calib) and she and I walked up to her sister residents. Her sister opened the door and let us in. Everything seem al right. I sat the rifle down at the door, and when we started to talke (sic) to Johnnie Lee, Lee Jackson came at me with a hatchet. He hit me on the left arm above the elbo, I jumped back and grabbed the rifle and as I was bringing the rifle up he struck me again on the lower part of my arm. I shot him one time, Then my wife jumped between us. and he swung at her with the hatchet and struck her on the hand (left) Then I shot him again. He staggered to the floor. I told Johnnie Lee to call the police and she did. After she called she left the phone off the hook, I told my wife to call and tell them to bring an amlance (sic) and shortly after that the police arrived.

Upon questioning Mr. Cook if he and his wife had been drinking up there he stated no that what he and his wife had drank was at their own home.

I have read this statement consisting of 2 pages (s), and I affirm to the truth and accuracy of the facts contained therein.

This statement was completed at 8:45 P. M., on the 12th day of March, 1973.

WITNESS: /s/ Lt. E. L. Arrington
WITNESS: ——————————

x /s/ Marshall Cook
Signature of person giving voluntary statement."

Appellant's wife and Mrs. Haggard were arrested at the same time that appellant was taken into custody, as they were under the influence of intoxicating liquors and were cursing in the presence of the officer. They were carried to the hospital for first aid treatment and then placed in jail charged with boisterous conduct.

The arresting officer found the chop axe on the floor a few feet from where Jackson was lying. He took possession of the axe and the rifle. The rifle was admitted in evidence without objection. Appellant offered the chop axe in evidence. The state objected on the ground that the proper predicate had not been laid, stating, "Defendant is the man who is going to have to identify this hatchet." The court sustained the objection, saying, "I believe he is right, the defendant will have to identify the hatchet." Subsequently, appellant's wife identified the axe as the one the deceased used in the fight with appellant and was the same axe that she and Mrs. Haggard tried to take from deceased at the time both women were cut by the deceased. She further testified that she had seen this same axe on several prior occasions in the hands of the deceased, and on the day before the homicide, the deceased pointed this axe at her and threatened to kill her and appellant when he got the chance. During her testimony, the axe was again offered in evidence and was ad-

mitted without objection. Mrs. Cook also testified that she told her husband about the threat to her life, and to appellant's life. Appellant did not recall his wife telling him that the deceased threatened to kill him, but did recall her telling him about the threat on the life of his wife. The deceased made other threats on the life of appellant but the testimony did not show that these threats were communicated to him.

At the funeral home, a blood sample was taken from the jugular vein of the deceased. This blood sample was placed in two vials by the funeral home employee who "took a piece of adhesive tape, and put it over the rubber top of it, and put my initials, date and time on it, and placed it in the refrigerator at the funeral home." He further testified that the next morning he personally removed these blood samples from the precise place in the refrigerator where he had placed them the night before and turned the vials over to a Deputy Sheriff to take to the State Toxicologist at Auburn, Alabama. On cross-examination this witness testified:

"Q. Did it appear to be in the same condition?

"A. Yes, sir, it appeared to be in the same condition.

"Q. To your knowledge, had it been tampered with?

"A. To my knowledge, it had not been tampered with.

"Q. But, you couldn't swear that someone hadn't 'done something to it, could you?

"A. Yes, sir.

"Q. You could?

"A. Yes, sir.

"Q. Someone couldn't have removed the adhesive, and done something with it then, without you knowing it?

"A. No sir, because my initials were on it, and to my knowledge, no one else has handwriting like mine.

"Q. But, you couldn't say that someone had removed it during the night, or handled it in any way?

"A. No sir, I couldn't say that.

Re-Direct:

"Q. Was it in the same location in the refrigerator, as where you had placed it the night before?

"A. Yes sir.

"Q. And you are swearing under oath, that, that bottle of blood had not been tampered with?

"A. Yes sir, I am."

The Deputy Sheriff testified that he received the blood samples from the employee at the funeral home and drove straight to Auburn, where he delivered the package to Mrs. Laura T. Chevelin in the office of the State Toxicologist.

Mrs. Chevelin testified that she was employed as a technician in the State Toxicologist Department; that on March 13, 1973, she received the blood samples and made a laboratory analysis. As to her education, she testified that she received a B. S. Degree in chemistry from Duke University, a M. S. Degree in physical chemistry from the University of California, and at Auburn University, she had taken courses in pharmacology, toxicology, and bio-chemistry. She completed two years of study in the Pathology Department at Auburn. The trial court ruled that Mrs. Chevelin was qualified by education and experience to give an opinion as to the laboratory analysis she made of the blood samples, and she testified that the blood contained 0.41 percent alcohol. The blood also contained 11 percent milligram acetone and 8 milligram percent asaprogon.

According to appellant's testimony, which was, in large part, supported by his wife and Mrs. Haggard, the deceased did not utter a word before he struck and cut him with the axe. Appellant was struck two blows with the axe before he fired the

first shot. He did not know if the first shot hit the deceased as it did not stop him. He saw deceased advancing on his wife with the axe raised above his head and saw the axe come down striking his wife on her left hand. He then fired the second shot. The deceased took a few steps, dropped the axe and fell to the floor.

Appellant was a veteran with 100% service connected disability. When he sought to introduce in evidence his medical records from the Veterans Administration Hospital in Tuskegee, Alabama, the state objected saying, "Because he had the defendant sitting right over there and he can testify as to his disabilities." The court examined the documents and ruled that they were properly certified and admitted same in evidence.

Appellant's medical records from the George H. Lanier Memorial Hospital, Langdale, Alabama, were properly certified and admitted in evidence. These records show that appellant was admitted to the emergency room on the day of the homicide with lacerations of the left arm above the elbow and the left forearm. The lacerations were sutured, a tetanus booster shot administered, and he was released in the custody of the Lanett Police Department.

Colored photographs, appellant's exhibits 7 and 8, showing wide-spread and extensive bruises on Mrs. Cook's upper left arm and right thigh were offered in evidence. The state objected and the court sustained the objection. Mrs. Cook testified that these bruises and injuries were received at the hands of the deceased when he struck her with the axe. These bruises and injuries were evident at the time of the trial, and she showed her left arm to the jury but the jury did not see and observe the injuries on her right thigh. These photographs were taken eight days after Mrs. Cook sustained her injuries.

Other photographs, appellant's exhibits 11 and 12, taken on the same date, showing bruises and injuries to the upper left ex-tremities of both Mrs. Cook and Mrs. Haggard, and the anterior thighs of Mrs. Haggard, were offered in evidence. The state objected and the court sustained the objection.

■ Appellant contends that the statements and comments of the Deputy District Attorney, during trial, on the admissibility of certain physical and documentary evidence to the effect that appellant was present and could testify with reference thereto constituted an infringement on his Fifth Amendment rights to testify or not at his own choice and election.

We are invited to re-examine our case of Gamble v. State, 44 Ala.App. 1, 200 So. 2d 500, cert. den. 281 Ala. 720, 200 So.2d 504, in the light of Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

In *Gamble,* supra, we held that the comment of the prosecuting attorney, during a discussion as to the admissibility of certain evidence, to the effect that the defendant could testify to something did not constitute prejudicial error on the theory that the statement amounted to a comment upon the defendant's failure to testify. In *Gamble,* supra, the defendant testified.

In our opinion, *Griffin* and *Chapman* are not controlling, and we are not disposed to say that our decision in *Gamble* is erroneous. In both *Griffin* and *Chapman* the defendants did not testify and there was *direct* comment on their failure to testify by both the prosecuting attorney and the trial judge. Here, as in *Gamble,* the appellant-defendant testified.

In Diamond v. State, 49 Ala.App. 68, 268 So.2d 850, we encountered a similar situation. There we said:

"The remark by the District Attorney was not one that the jury would understand to be a comment on the appellant's failure to testify. It is the directing of the minds of the jurors to the fact that a

defendant *has failed* to testify that the harm is done. This was an incident of the trial and not intended and could not be construed by the jury as criticizing or commenting upon the defendant's subsequent failure to testify. While we do not approve of the remark, we do not think it is equivalent to a comment or a reference prejudicial to appellant."

■ Appellant claims reversible error intervened when the state failed to account for the whereabouts, possession, and condition of the blood samples taken from the body of the deceased during the entire period of time from its extraction until it was delivered to the State Department of Toxicology, and therefore, the evidence relating to the results of the chemical analysis conducted by the State Toxicologist should not have been admitted in evidence. We have related the chain of possession of the blood samples, and we find no missing link in the chain. We hold the identification and continuity of possession were sufficiently established to afford ample assurance of the authenticity of the blood samples and the analysis made by the Toxicologist. Powell v. State, 47 Ala.App. 582, 258 So.2d 923; Green v. State, 42 Ala.App. 439, 167 So.2d 694; Lackey v. State, 41 Ala.App. 46, 123 So.2d 186; Dennison v. State, 259 Ala. 424, 66 So.2d 552.

■ Appellant fired the second shot when he saw the deceased striking his wife with the axe. In this connection, the trial court charged the jury as follows:

"I want to tell you about self-defense as applied in this case. You have the right to protect your wife, your own wife, if the wife could have pleaded self-defense, as I have described to you. The wife must be free from (fault in) bringing on the difficulty, free from fault, and also, be about to get great bodily harm to her, or death, and there must be no avenue of escape. You decide on the facts in this case, whether or not this defendant proved to you, the elements of self-defense."

The photographs of appellant's wife showing the nature and extent of the injuries inflicted upon her by the deceased at the time of the fatal shooting were relevant and material as showing the severity and gravity of the assault upon her. The court committed reversible error in sustaining the state's objection to the introduction of these photographs. The fact that these photographs were made eight days after the homicide did not render them inadmissible for that reason. The evidence offered in support of the photographs clearly showed they correctly depicted the condition which existed after the shooting. It has been uniformly held appropriate to admit photographs of the body of the victim of a crime to illustrate the place of the wounds or the gravity of an assault. Aaron v. State, 271 Ala. 70, 122 So.2d 360.

■ The fact that such evidence is cumulative does not affect its admissibility so long as it sheds light upon a material inquiry, illustrates the transaction at issue, or tends to elucidate the material facts under inquiry, and has a tendency to illustrate the severity of the assault. Swindle v. State, 27 Ala.App. 549, 176 So. 372; Wilson v. State, 31 Ala.App. 21, 11 So.2d 563; Reedy v. State, 246 Ala. 363, 20 So.2d 528; Grissett v. State, 241 Ala. 343, 2 So.2d 399.

We think the rule is best stated by the Supreme Court in McKee v. State, 253 Ala. 235, 44 So.2d 781, wherein it was said:

"We think we are safe in stating as a general and well settled proposition of law that the courts in this country take judicial knowledge that the art of photography is generally relied on for depicting the resemblance of persons, objects, things and places and when verified by evidence, extrinsic of the photographs, going to show that they correctly depict the thing or object at the time they were taken, photographs are admissible in evidence in a criminal prosecution, if they tend to shed light on,

strengthen or illustrate the truth of other testimony offered by the prosecution. This proposition is supported by the following cases. Luke v. Calhoun County, 52 Ala. 115, 118 (decided more than three quarters of a century ago); Wilson v. United States, 162 U.S. 613, 16 S. Ct. 895, 40 L.Ed. 1090; Hall v. State, 78 Fla. 420, 83 So. 513, 8 A.L.R. 1034.

We also approve so much of the text taken from 20 Am.Jur. pp. 611–612, § 732, which reads as follows: 'A photograph of a person or of some part of the body which is shown to be a proper representation of its subject is admissible to prove his appearance or condition at the time of the injuries, or to prove the condition of, the extent of injuries to, etc., the part of the body photographed, as the case may be * * *.'

'* * * The sole question is whether the physical evidence will assist, and not mislead, the jury in understanding the matter before them. It is not necessary that the object sought to be admitted be in exactly the same condition as at the time of the occurrence of the fact that it is intended to illustrate; such a requirement would make evidence of this nature inadmissible in practically all cases, since it is hardly ever possible to reproduce conditions exactly. So it is that the fact that clothing of the deceased has been washed will not affect its admissibility, where the purpose of offering it in evidence is to establish the size and location of wounds. In a prosecution for manslaughter, the shirt of the deceased, from which a piece of cloth had been taken for experimental purposes, was, nevertheless, admissible. In the same case it was held that an automobile fender had not been substantially changed, and it was therefore admissible, although a dent in the fender had been covered with shellac to prevent corrosion. The rear halves of garments of a person shot in the back have been held admissible. There was no error in admitting in evidence a photograph of the deceased, taken after the performance of an autopsy, even though the photograph showed marks of incisions made for the purposes of the autopsy, the autopsy surgeon pointing out to the jury the marks resulting from his examination.' Wharton Cr.Ev. Vol. 2, p. 1282, § 757 and cases cited to support the text.

The formula laid down by the Court of Appeals would render inadmissible the photographs taken by Dr. Rehling at the time of the autopsy although his testimony may have shown that they correctly depicted the wounds, bruises and abrasions on the dead body at the time the photographs were made and that said photographed wounds were, in his opinion, made prior to death; that such wounds were easily distinguishable from abrasions, bruises, injuries and punctures made on or in the corpse at the time it was embalmed or when it was exhumed from the grave. The fact that the photographs were made after exhumation, eight days after death, goes to the weight of the evidence not to its admissibility.

Courts and juries cannot be too squeamish about looking at unpleasant things, objects or circumstances in proceedings to enforce the law and especially if truth is on trial. The mere fact that an item of evidence is gruesome or revolting, if it sheds light on, strengthens or gives character to other evidence sustaining the issues in the case, should not exclude it. Grissett v. State, 241 Ala. 343, 2 So.2d 399, 401; Green v. State, 252 Ala. 513, 41 So.2d 566; Blue v. State, 246 Ala. 73, 19 So.2d 11; Pilley v. State, 247 Ala. 523, 25 So.2d 57. The general rule is well established that the trial court is vested with judicial discretion in determining the sufficiency of preliminary evidence offered to establish a predicate for the admission of other evidence on the trial, to be exercised in the light of the circumstances in the particular case, and this discretion will not be reviewable except for gross abuse.

DeForge v. New York, N. H. & H. R. Co., 178 Mass. 59, 59 N.E. 669, 86 Am. St.Rep. 464; Com. v. Tucker, 189 Mass. 457, 76 N.E. 127, 7 L.R.A.,N.S., 1056; Pope v. State, 183 Ala. 61, 63 So. 71.

'The question of the sufficiency of the preliminary proofs offered to identify the photograph or to show that it is a fair and accurate representation of the objects which it purports to portray is a matter within the discretion of the trial court. Some cases say that the determination of the trial court is final or not open to exception or review on appeal, but it is apparent that it was not the intention of these cases to hold that the admissibility of photographs rests finally with the trial judge.' 20 Am.Jur. p. 610, § 730."

There are other insistences of error but to respond to all of them will unduly extend this opinion. These claimed errors will not likely occur when this case is retried.

For the errors indicated this case is reversed and remanded for a new trial.

Reversed and remanded.

All the Judges concur.