LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a conviction of murder in the first degree of Robert Burke and a sentence to imprisonment for life.
Two Mobile police officers testified that early in the morning of June 3, 1979, they answered a call to go to a home at 701 Euclid Avenue in that city, where they found the dead body of the alleged victim lying in the living room with a gunshot wound in his head. There was much blood in and about the premises, and the furniture was in great disarray. A police investigation was commenced and about two weeks thereafter defendant was found sleeping under a bridge on - Government Boulevard, where he was apparently “camping” at the time. He was then and there taken into custody.
The only eyewitnesses to the homicide who testified were Frank Wendt and Carl Coleman Ritchie, Jr. The defendant did not testify. Wendt and Ritchie testified that they were “celebrating” at the home of the victim on the night of June 3, 1979,[1] which according to other evidence in the case was before the body of the victim was found by the officers on the morning of June 3. The two young men had already been to several clubs that night, had drunk some beer and smoked some marijuana. They smoked marijuana while they were at the home of the victim. While they were there, a man entered with a stocking mask and a pistol. The man attacked the victim, and there was then a fight among the four men. According to their testimony, the intruder shot the victim in the head, shot Wendt in the head and severely knifed Wendt and Ritchie. About the time the intruder left, Wendt and Ritchie left the house, calling for help in the neighborhood, and one of them was sent to the hospital. Wendt testified that at one time the intruder said, “I’m gonna have to kill you, Robert. You know I’m gonna have to shoot you.” Neither of the witnesses was able to identify the assailant positively, but both testified in effect that the defendant looked like him or resembled him. Both of the witnesses indicated an acquaintance and former dealings with the deceased and that the deceased had been an habitual smoker of marijuana and had sold it.
*144 Allen Watkins, another witness called by the State, testified that about a week after June 3, 1979, he was at his home with several others including the defendant. The following is part of his testimony:
“Q. What did he [defendant] tell you?
“A. All right. He told me about how he got into these guys house and about how he shot them, and about the cocaine—
“Q. What did he say about cocaine?
“A. All right, he said that the guys that he robbed were cocaine dealers; they had a lot of cocaine and they had some money; that’s what he was after.
“Q. That’s what he was after?
“A. Yeah.
“Q. What else did he tell you about what went on over there?
“A. All right, he told me that he broke in on them and there were three of them, and that he made them lay down on the floor, and he threw a blanket over them, and they had a pistol, and he went along and he shot two of them in the head, and the gun jammed, and when the gun jammed the third one jumped up and threw the blanket at him, and he had a knife, and he pulled his knife, and stabbed this other guy.
“Q. Did he say how many times he stabbed anybody?
“A. Yes, he did. I believe he told me twenty-one times, or twenty-seven times. I’m not sure, it’s been a while.
“Q. Did he mention anything about having seen any of these people before?
“A. Yes, sir.
“Q. What did he say?
“A. He said the one guy that he killed, he said that he broke in his house before, a couple_

“A. All right. He said that he had broke in this guy’s house once before and caught him asleep in bed and tied him up, and cut him up, and robbed him.
“Q. Did he say what he robbed him of on that occasion?
“A. I believe just some change in a bottle and some marijuana.
“Q. What was his demeanor like when he was telling you about all this? What was he acting like?
“A. Well, he was — he was scared that he was gonna get caught, and he didn’t know what he was gonna do, but he was bragging about how he done it.
“Q. Bragging?
“A. Yes, sir.”
We have seen no need to detail the testimony of Wendt and Ritchie as to all that occurred the night Robert Burke was killed, but details of their testimony are very similar to those narrated as shown above in the testimony of Allen Watkins. At least two other witnesses substantially corroborated the testimony of Allen Watkins as to what the defendant told him about a week after the death of Robert Burke.
Mary Virginia Price testified that in March 1979, she saw defendant at the apartment of a named person where others had gathered and that they “were all doing speed.” She said defendant was “running around saying he had something he had to do.” Her testimony continued:
“Q. And what kind of conversation did you and Mr. McGuire have?
“A. He just was_had some stuff he
had to do. He didn’t tell me what it was.
“Q. Did he_did you see a weapon?
“A. Later in the night I did.
“Q. Did he leave the apartment that night?
“A. Yes.
“Q. Did you stay there?
“A. I stayed for a while.
“Q. Did you see him later that night at the same apartment?
“A. Yes. In the A.M., in the morning.
“Q. Early that morning?
“A. Yes.
“Q. Did you all have any sort of a conversation at that point?
“A. He at that time had robbed Robert Burke.”
Further on in her testimony she said:
“Q. When he came back, did he tell you anything about where he had been?
*145 “A. He had_told me and then I saw the wallet that he had taken and it had Robert Burke’s name on the credit cards and his driver’s license.
“Q. Did he say what he had done?
“A. He said he robbed him and he was laughing about it, giggling, thought it was funny because he beat him up a little bit.”
No contention is made that a jury issue was not presented as to the guilt of the defendant of murder in the first degree, and we see no reasonable basis for such a contention.
One of the two insistences on error is to the effect that the trial court should not have admitted in evidence, over the objection of defendant, or permitted the State’s counsel to argue as to such evidence, that defendant had been heard to say prior to the commission of the crime alleged in this case that he had previously robbed the alleged victim. The insistence is directed chiefly to the testimony of Mary Virginia Price, which we have stated in large part above. Appellant argues that the admission of such evidence is violative of the general exclusionary rule “that evidence of distinct and independent offenses is not admissible in the trial of a person accused of a crime.” Appellant is correct as to the general rule, but he is not correct in assuming that the evidence of his admission of the previous crime does not constitute a valid exception to the general exclusionary rule. Although there was other evidence sufficient to present a jury issue as to the identity of defendant as the person who killed the alleged victim, the motive of the person who killed him was of importance in connection with the issue of defendant’s guilt of murder in the first degree as charged or of any lesser included crime. The testimony as to the former crime was some evidence tending to show that the motive of defendant in killing the victim was to rob the victim of controlled substances that he possessed, or that defendant believed he possessed. The evidence also had a bearing on the issue of the intent of defendant in firing the shot that killed the alleged victim. The evidence was properly admitted. Allen v. State, Ala.Cr.App., 380 So.2d 313, 328-330 (1979), cert. denied, 380 So.2d 341; Chambliss v. State, Ala.Cr.App., 373 So.2d 1185, 1207 (1979), cert. denied, Ala., 373 So.2d 1211.

“The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant’s bad character. If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such other act is admissible. “....” Gamble, McElroy’s Alabama Evidence, § 69.01(1) (1977)
After the jury had been selected and sworn, before any evidence was presented, and during the time the attorneys were making their opening statements as to what they expected the evidence to show, the following occurred:
“MR. COPELAND [Counsel for the State]: The evidence will also show you what kind of a man David McGuire is. He bragged to several of his friends about this. He bragged about it. He did have the cunning to say that when the first man was killed it was an accident. I don’t think he can explain the rest of it.
“MR. SCHEUERMANN [Counsel for Defendant]: Judge, I’m going to object to that statement by the District Attorney, ‘I don’t think he can explain the rest of it.’
“THE COURT: And I sustain the objection, and direct the jury to ignore it.
“MR. SCHEUERMANN: Move for a mistrial.
“THE COURT: And I deny that motion.”
Appellant argues that by that which is quoted above it is shown that the District Attorney made a “comment concerning the defendant’s failure to testify” in violation of Code of Alabama § 12 — 21— 220, and that the court committed reversible error in denying defendant’s motion for a mistrial. Appellant argues that it “is *146 obvious from the facts of this ease that this statement by the District Attorney was a direct comment on the failure of the Defendant to testify.” The full meaning of the statement is not clear to us. The context thereof is not shown by the transcript. Perhaps it is referable to a part of a written statement made by the witness Allen Watkins that he had given to the prosecution in the investigative phase of the case, which is in the transcript as Defendant’s Exhibit A, which defendant’s counsel used in cross-examining the witness to show that therein the witness had stated that at the time the defendant made the oral incriminating statement as to what occurred, the defendant was drunk. One sentence in defendant’s Exhibit A is, “He [defendant] said that Robert was laying in the middle and Robert grabbed for the gun and the gun went off and he shot Robert.” Although invariably in opening statements as to what counsel expect the evidence to show, State’s counsel should scrupulously avoid attenuating the right of a defendant not to testify, by making any statement that would cause a jury to hold against the defendant the fact that he does not testify, more is required than that which is shown above to convince us that such was the intent or the result of what the district attorney said. We are not convinced that there was a violation of either the letter or the spirit of Code § 12-21 — 220. The transcript does not include any of the statement of counsel for defendant as to what he expected the evidence to show, nor does the transcript disclose whether the quoted statement of State’s counsel was before or after defendant’s counsel had made his statement.
From among the many authorities on the subject of the duty of State’s counsel to refrain from making any “comment concerning the defendant’s failure to testify” and the result thereof, appellant has selected Beecher v. State, 294 Ala. 674, 320 So.2d 727, 729-734 (1975), wherein the Supreme Court considered the Constitution of Ala. of 1901, § 6, giving it emphasis in connection with the particular Code Section, now § 12-21-220. Appellant quotes the following from “Beecher v. State at page 734” :
“Thus we hold today that where there is the possibility that a prosecutor’s comments could be understood by the jury as reference to failure of defendent to testify, § 6 is violated.”
The statement of the prosecuting attorney in Beecher v. State was, “No one took the stand to deny it” and was made in his closing argument to the jury. The disagreement between the parties on the trial and on appeal was whether the statement was a mere reference to the undisputed nature of the testimony that no one denied, as contended by the State, or, on the other hand, whether it included a comment upon the failure of defendant to testify, as contended by defendant. That disagreement was thoroughly ventilated in the trial court in a lengthy colloquy in which the attorneys and the trial court engaged.
In the instant case there was a motion for a mistrial in addition to an objection to the statement, but nothing was said as to the question whether the statement constituted a comment forbidden by § 12-21-220. If the particular point raised now had been raised on the trial, the trial court would have been, and this Court would now be, better able to determine whether the “possibility” existed that the statement “could be understood by the jury as reference to failure of defendant to testify.” A correct determination would have been aided then, and would be aided now by an expression of the views of counsel for both parties at the time the ruling of the court was invoked, as to the full meaning or implication of the statement. We do not have the benefit of the light that was shed upon the question in Beecher that enabled the Supreme Court to conclude that such possibility did exist. It seems but natural that even if counsel for defendant had then thought that such a possibility existed he would have made the point at the time and thereby exposed it to the view and consideration of all concerned.
To hold that defendant’s motion for a mistrial should have been granted would not have support in Beecher v. State. We find it to the contrary as stated at 320 So.2d 734-735:
*147 “But it is concomitantly the duty of the prosecutor not to, in any manner, comment on the failure of the defendant to testify. Thus if there exists the possibility that the prosecutor has commented in such a manner that the jury may understand it as a comment on the defendant’s failure to testify, it is for the trial court to cure this violation of prosecutorial duty by prompt and vigorous instructions to the jury informing them of defendant’s right not to be compelled to testify and that they may draw no presumption from his decision not to testify. Tillis v. State, 292 Ala. 521, 296 So.2d 892 (1974), and cases cited therein. In this regard we note that some comments can be so prejudicial as to be ineradicable. Stain v. State, 273 Ala. 262, 138 So.2d 703 (1961); McLemore v. International Union, 264 Ala. 538, 88 So.2d 170 (1956) (noncriminal case).
“. .. The trial court took no action to cure the effect of the prosecutor’s comment. In this posture we cannot say that Beecher received a fair and impartial trial, free of constitutional infirmity, to which he and all other persons are entitled.”
The trial court sustained defendant’s objection to the statement and excluded it from the consideration of the jury. It was correct in doing so, we think, because it was not in the province of opening statements but was in the nature of argument. We do not say that it would have been reversible error for the court to have overruled the objection, but the ruling was commendable in that it is inappropriate for counsel to incumber trials by attempting to make arguments to the jury until the proper time therefor, after the evidence has been presented.
The court was correct in denying defendant’s motion for a mistrial.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.

. The night of June 3 was referred to loosely in the evidence, without any distinction between whether it was before or after midnight of June 2-3.