516 So.2d 768 (1986)
Ex parte Carnel JACKSON
(Re: Carnel Jackson v. State of Alabama).
84-1112.
Supreme Court of Alabama.
December 19, 1986.
Specially Concurring Opinion on Denial of Rehearing February 20, 1987.
L. Dan Turberville, Birmingham, for petitioner.
Charles A. Graddick, Atty. Gen., and Rivard Melson and William D. Little, Asst. Attys. Gen., for respondent.
TORBERT, Chief Justice.
This is a death penalty case arising from defendant Carnel Jackson's convictions under Code 1975, § 13A-5-31(a)(10) (repealed) (murder in the first degree wherein two or more human beings are intentionally killed by the defendant) and § 13A-5-31(a)(3) (repealed) (rape when the victim is intentionally killed by the defendant).
Following the jury verdicts of guilty on the charged offenses, a sentencing hearing was held in which the jury determined that the punishment should be death. The trial court then held its own sentencing hearing and sentenced defendant to death. The Court of Criminal Appeals, following the procedures outlined in Beck v. State, 396 So.2d 645 (Ala.1980), affirmed defendant's *769 convictions and death sentence. Jackson v. State, 516 So.2d 726 (Ala.Crim.App.1985).
On January 17, 1981, the bodies of the victims, Myra Faye Tucker and Terry Wayne Tucker, were discovered on an old mining road in Jefferson County. Both victims had been shot one time with a 12-gauge shotgun. Mr. Tucker had been shot in the back. The autopsy on Mrs. Tucker's body indicated that she had been shot in the chest area and that she had been repeatedly raped. The blood type of the seminal fluid found in Mrs. Tucker's body did not match the blood type of her husband, but it did match the blood type of defendant and one codefendant.
Within one week of the discovery of the murders, the police arrested defendant and two codefendantsJerry Steven Godbolt and Wayne Anthony Agee. At the time of the murders, defendant was 17 years of age, Agee was 19, and Godbolt was 21. During this same time, the police also recovered a 12-gauge shotgun from the front yard of Godbolt's mother. Wadding and spent shells found at the scene of the murders were later identified at trial as being from the type of shotgun found by the police.
At the time of his arrest, defendant refused to give a statement to the police concerning the incident. In September of 1981, however, defendant called the detective in charge of the Tucker murder case and requested that he come to the county jail. When the detective got to the jail, defendant informed him that he would be willing to testify against both Agee and Godbolt. The detective then read defendant the Miranda warnings and asked him if he wanted his attorney present for the statement. After acknowledging that he understood his rights and stating that he did not wish to speak with or see his attorney, defendant made a statement that was later used at trial. In the statement, defendant stated that he and his codefendants were on drugs at the time of the crime and that they intended to "rob some place." Defendant also stated that he had taken the shotgun from Godbolt and had killed Mrs. Tucker first and then Mr. Tucker.
The Court of Criminal Appeals gave a thorough examination of the issues Jackson has raised on appeal. We will discuss three of these issues in detail.

I
The Court of Criminal Appeals held that the Birmingham Division of the Circuit Court of Jefferson County had proper venue in this case. Jackson contends that the Birmingham Division lacked jurisdiction and that this action should have been brought in the Bessemer Division. In its opinion the Court of Criminal Appeals cited Agee v. State, 465 So.2d 1196 (Ala.Crim. App.1984), cert. denied, 465 So.2d 1196 (Ala.1985), for the propositions that the Bessemer Court Act of 1919, 1919 Ala. Local Acts 62, No. 213 (August 18, 1919) (Local Laws of Jefferson County, §§ 950-957, page 320), should be read as venue legislation rather than jurisdiction legislation and that the two divisions should be treated as if they were two separate counties. We agree.
"The Bessemer Cutoff legislation does not diminish the general jurisdiction of other circuit courts, either in Jefferson or other counties." Glenn v. Wilson, 455 So.2d 2, 4 (Ala.1984). Although there was much testimony at trial that the murders in this case occurred in the Bessemer Division, there was some testimony that the murder scene was in the Birmingham Division. Venue may be established by the testimony of one witness. McCrary v. State, 398 So.2d 752 (Ala.Crim.App.), cert. denied, 398 So.2d 757 (Ala.1981).
Furthermore, at the hearing on defendant's motion to dismiss, Jackson and the State agreed that the evidence before the trial judge at that time showed that the bodies of the Tuckers were located within a quarter-mile of the line that divides the two divisions. The evidence showed that the Tuckers were killed where their bodies were found. Again relying on Agee, supra, the Court of Criminal Appeals held that since the two divisions are to be treated as if they were separate counties, then Code 1975, § 15-2-7, would come into effect. *770 Section 15-2-7 authorizes a finding of proper venue in either county when an offense is committed within a quarter-mile of the boundary between the two counties. This Court has not previously addressed the question of whether § 15-2-7 should apply to the two judicial divisions within Jefferson County. Since the legislation that created the two divisions in Jefferson County is venue legislation, Glenn, supra, we hold that the Court of Criminal Appeals correctly applied § 15-2-7.
While it was not error on the part of the trial court to deny Jackson's motion for change of venue to the Bessemer Division, we note that, based on the evidence before the trial court at the hearing on the motion, it would have been the better practice to transfer the case to the Bessemer Division.

II
Jackson also contends that Act No. 81-178, Alabama Acts 1981, the 1981 capital offense statute, repealed the statute under which the indictments against him were returned and that any prosecution pursuant to those indictments is now void. This argument is without merit. As this Court noted in Ex parte Julius, 455 So.2d 984, 985 n. 1 (Ala.1984), "the repeal of §§ 13A-5-30 through -38 did not affect the applicability of those sections to conduct that occurred before July 1, 1981."

III
We have searched the record for any plain error or defect in the proceeding below, Rule 39(k), A.R.A.P., and have found none except that now to be discussed.
The most compelling of the issues raised by Jackson is whether his equal protection rights were violated when the prosecution used its peremptory challenges to strike all ten of the prospective black jurors from the venire. The United States Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986), changed a defendant's burden of proof on the issue of the prosecution's using peremptory challenges to systematically exclude blacks from serving on the jury. The much more stringent burden of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), was in effect at the time of defendant's trial, and the issue before us is whether a rule similar to the rule announced in Batson should be applied to this defendant's trial. We hold that a rule like the rule which the United States Supreme Court announced in Batson v. Kentucky, supra (that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial," 476 U.S. at 96-97, 106 S.Ct. at 1722-23), is to be applied to Jackson's trial.
The United States Supreme Court has stated, "As a rule, judicial decisions apply `retroactively.' Robinson v. Neil, 409 U.S. 505, 507-08, 93 S.Ct. 876, 877-78, 35 L.Ed. 2d 29 (1973). Indeed, a legal system based on precedent has a built-in presumption of retroactivity." Solem v. Stumes, 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984).
That Court, in several decisions, established the following three-pronged test for determining whether a newly announced standard of law should be given retroactive application: (1) the purpose to be served by the new standard, (2) the extent of reliance by law enforcement authorities on the old standard, and (3) the effect on the administration of justice of a retroactive application of the new standard. See e.g., Adams v. Illinois, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972); Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). In Adams, supra, the three-Justice plurality noted:
"We have given complete retroactive effect to the new rule, regardless of good-faith reliance by law enforcement authorities or the degree of impact on the administration of justice, where the `major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding *771 function and so raises serious questions about the accuracy of guilty verdicts in past trials....' Williams v. United States, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971)."
405 U.S. at 280, 92 S.Ct. at 918.
The Batson Court recognized that more than a century ago Strauder v. West Virginia, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880), held that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of this race have been purposefully excluded. The Court noted that the Strauder decision laid the foundation for the Supreme Court's "unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn." 476 U.S. at 85, 106 S.Ct. at 1716. In Swain v. Alabama, 380 U.S. 202, 203-04, 85 S.Ct. 824, 826-27, 13 L.Ed.2d 759 (1965), the Court ruled that "A State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause."
Batson reduced a defendant's burden of making a prima facie case of racial discrimination in the prosecution's use of peremptory strikes. The Swain burden has often been criticized. The United States Supreme Court noted that lower courts' interpretation of Swain "has placed on defendants a crippling burden of proof." 476 U.S. at 92, 106 S.Ct. at 1720. The Second Circuit Court of Appeals has called this burden a "mission impossible." McCray v. Abrams, 750 F.2d 1113, 1120 (2d Cir.1984). In the face of the harsh burden of Swain, several state courts have found that their state constitutions required a lesser burden on a defendant. See State v. Neil, 457 So.2d 481 (Fla.1984); People v. Thompson, 79 A.D.2d 87, 435 N.Y.S.2d 739 (1981); State v. Crespin, 94 N.M. 486, 612 P.2d 716 (Ct.App.1980); Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed. 2d 110 (1979); People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978).
The Second Circuit in McCray, supra, gave an excellent summary of the state court cases cited above and their analyses of their state constitutions. The California Supreme Court found that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution." Wheeler, 22 Cal.3d at 276-77, 148 Cal.Rptr. at 903, 583 P.2d at 761-62. In Soares, supra, the Supreme Judicial Court of Massachusetts wrote:
"What we view art. 12 of the Declaration of Rights as proscribing is the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community. Were we to decline to so hold, we would leave the right to a jury drawn from a representative cross-section of the community wholly susceptible to nullification through the intentional use of peremptory challenges to exclude identifiable segments of that community."
377 Mass. at 486, 387 N.E.2d at 515.
We particularly note the holding of the Florida Supreme Court in Neil, supra:
"Article I, section 16 of the Florida Constitution guarantees the right to an impartial jury. The right to peremptory challenges is not of constitutional dimension. The primary purpose of peremptory challenges is to aid and assist in the selection of an impartial jury. It was not intended that such challenges be used solely as a scapel to excise a distinct racial group from a representative cross-section of society. It was not intended that such challenges be used to encroach upon the constitutional guarantee of an impartial jury. As did the New York, California, and Massachusetts courts, we find that adhering to the Swain test of evaluating the peremptory challenges impedes, rather than furthers, article I, section 16's guarantee. We therefore hold that the test set out in Swain is no longer to be used by this state's courts when confronted with the allegedly discriminatory *772 use of peremptory challenges."
457 So.2d at 486.
Although we know that the United States Supreme Court has not yet ruled on whether Batson v. Kentucky is to be applied retroactively, this Court does not need to await revelation from the federal judiciary when our own state constitution also guarantees to a criminal defendant the equal protection of the laws. Sections 1, 6, and 22, Ala. Const. 1901, combine to guarantee equal protection of the laws. City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977). Analysis of equal protection issues under the United States Constitution is equally applicable to those same issues under the Alabama Constitution. Jefferson County v. Braswell, 407 So.2d 115 (Ala.1981).
The doctrine of equal protection of the laws requires that the guarantee of trial by an impartial jury not be illusory. The defendant Jackson was under the Swain burden when he attempted to show the prosecution's alleged discriminatory use of its peremptory strikes. This was too great a burden. Our state constitution requires that Jackson be entitled to test the prosecution's use of its peremptory strikes under a rule similar to the one set forth in Batson v. Kentucky:
"[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group [citation omitted], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' [Citation omitted.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raise the necessary inference of purposeful discrimination.
In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."
476 U.S. at 96-97, 106 S.Ct. at 1722-23.
Once the defendant has made a prima facie case of purposeful discrimination, then the prosecution must come forward with valid non-racial reasons for its strikes. The Florida Supreme Court has given an illustration of the prosecution's burden:
"The reasons given in response to the court's inquiry need not be equivalent to those for a challenge for cause. If the party shows that the challenges were based on the particular case on trial, the parties or witnesses, or characteristics of the challenged persons other than race, then the inquiry should end and jury selection should continue. On the other hand, if the party has actually been challenging prospective jurors solely on the basis of race, then the court should dismiss that jury pool and start voir dire over with a new pool."
Neil, 457 So.2d at 487.
No merely whimsical or fanciful reason will suffice as an adequate explanation. In light of the circumstances of the case, the *773 trial court must use its discretion in determining whether the prosecutor's reasons are adequate.
Since the prosecutor in this case was never required to give explanations for his striking all the blacks from the venire, we remand this case to the Court of Criminal Appeals for it to order further proceedings. If the trial court determines that the facts establish a prima facie case of purposeful discrimination and the prosecution does not come forward with race-neutral explanations for its strikes, then Jackson is entitled to a new trial.
REMANDED.
MADDOX, JONES, ALMON, SHORES, BEATTY, ADAMS and STEAGALL, JJ., concur.
HOUSTON, J., concurs in the result.
HOUSTON, Justice (concurring in the result):
I would await the decision of the United States Supreme Court as to whether Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986), is to be applied retroactively in cases in which this issue was not preserved during trial. Clearly, Batson should be applied in this case because the issue was raised. The defendant is black; the victims were white; and all blacks were struck from the jury venire.
The defendant filed a timely motion to restrict prosecutorial strikes, in which the defendant alleged a systematic exclusion of blacks from jury panels by the district attorney's office through the use of peremptory challenges.
The state first struck a white male. The prosecutor's next ten consecutive strikes were the ten blacks remaining on the panel. Following the state's eleventh strike, at which time all blacks had been peremptorily struck, the defendant renewed his motion to restrict prosecutorial strikes. The defendant moved for a mistrial on the ground that the defendant had been denied his right to a jury trial by his peers due to the conduct of the state in systematically excluding all blacks from the jury to try the defendant. The state was offered an opportunity to be heard. It did not state any reasons for the use of peremptory challenges to exclude all blacks from defendant's jury.
I concur in the result.
MADDOX, Justice (Concurring specially).
Because the petitioner raised the question of the prosecutor's exercise of his peremptory challenges in the trial court in this case, and because his case is still pending on direct review, I agree that the case must be remanded to the trial court under the principles of law set forth in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Griffith v. Kentucky, ___ U.S. ___, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In other words, this case is within the "stream of similar cases" and defendant Jackson is "similarly situated" to defendants Batson and Griffith.
In Griffith v. Kentucky, the Court pointed out:
"As a practical matter, of course, we cannot hear each case pending on direct review and apply the new rule. But we fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final. Thus, it is the nature of judicial review that precludes us from `[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule.' [Mackey v United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) ]. See United States v. Johnson, 457 U.S. [537], at 546-547, 555 [102 S.Ct. 2579, 2585-2586, 2590]. [Emphasis added.]
"* * *
"Second, the use of a `clear break' exception creates the same problem of not treating similarly situated defendants the same. James Kirkland Batson, the petitioner in Batson v. Kentucky, and Randall Lamont Griffith, the petitioner in the present Kentucky case, *774 were tried in Jefferson Circuit Court approximately three months apart. The same prosecutor exercised peremptory challenges at the trials. It was solely the fortuities of the judicial process that determined the case this Court chose initially to hear on plenary review. JUSTICE POWELL has pointed out that it `hardly comports with the ideal of "administration of justice with an even hand."' When `one chance beneficiary the lucky individual whose case was chosen as the occasion for announcing the new principleenjoys retroactive application, while others similarly situated have their claims adjudicated under the old doctrine.'" (Emphasis added.)
___ U.S. at ___, 107 S.Ct. at 713-716.
This case does not present a situation in which the defendant did not preserve for review his constitutional claim. Cf. United States v. Wilson, 158 F.Supp. 442, 450 (M.D.Ala.1958), wherein Judge Johnson held that the failure of the defendant to raise any objections to the qualification of jurors prior to going to constituted a waiver of the objections.