The appellant, Ricky Funches, was found guilty of the murder of Donald Curtis and was sentenced to twenty-five years in the state penitentiary.
Carolyn Dukes, the girlfriend of Curtis, testified that she and Curtis were driving in her car along a street when the appellant, who was on the side of the street, called to Curtis. Curtis got out of the car on the driver's side and walked to the back of the car, where he stood with the appellant. Ms. Dukes further testified that the appellant asked Curtis why he had told "those people" that the appellant "had taken the T.V." Curtis then denied telling anyone that the appellant had taken the television, and a fight ensued. Ms. Dukes testified that she did not observe any weapon on Curtis. She observed the appellant pull a gun from his clothes and shoot Curtis. She identified the appellant in court as the man who had shot Donald Curtis. She further testified that after he had been shot, Curtis fell onto the back of her car, slid on the trunk, and fell to the ground. As she was beginning to emerge from her car, the appellant stood over the victim, and pointed the gun, but, she said, "the gun clicked." Thereafter, he began running away and Ms. Dukes pursued him. When she caught up with the appellant, she asked him why he shot Donald Curtis. He replied that if she did not "get away from behind" him, that he would also shoot her. She further testified that Dale Gamble, a friend of the appellant, then knocked the gun down and the appellant ran away.
Dale Gamble testified that the appellant's mother gave the appellant and Gamble a ride to Whistler Avenue. Dale Gamble testified that he stopped to talk to someone and the appellant turned and walked down the street. Gamble further testified that he thereafter heard a shot and ran to the corner, where he observed the victim leaning against a car with blood coming from his mouth. He testified that Ms. Dukes was shouting, "Rick, you shot him, you shot him." He testified that the appellant turned and had the gun in his hand. The appellant then stated, "I'll shoot you." Gamble knocked his gun hand down, whereupon the appellant turned and left.
Arthala Donaldson testified that he lived close to Whistler Avenue and that, on the day in question, he was standing outside his gate, talking to a neighbor. He stated that his attention was drawn to the corner when he heard loud cussing. He testified that he observed "this guy that got killed with his hands in the air and I seen that guy there pull a pistol"; whereupon, he identified the appellant in court as the man who had pulled the pistol. He further testified that the victim apparently had no weapon, as he observed both of his hands in the air. He testified that when the appellant fired the gun, the victim grabbed his chest and wheeled onto the trunk, and fell backward onto the ground. After Donaldson observed the appellant run away, he went into his house to call the police.
Enis Reidy, a Mobile police officer and formerly a Prichard police officer, testified that he found the victim lying face up in the middle of the street behind a green Ford and observed no weapons at the location.
The appellant took the stand and testified that Curtis yelled at him from the car, stating that he wanted to talk to the appellant. He further testified that Dale Gamble was with him when he was talking to Curtis at the back of the car. He testified that Curtis "flicked out his blade," when they started arguing and that Curtis hit the appellant in the left shoulder with his knife. He testified that Dale Gamble passed him the gun, whereupon the appellant told Curtis that he was not going to allow Curtis to hurt him. Thereafter, he stated, Curtis drew the knife back, apparently to stab him again, and therefore the appellant shot him. He testified that he then left the scene with Dale Gamble and passed the gun back to Gamble. He stated that because he was scared, he went to Chicago, Illinois, where his father lived.
 I.
The appellant argues that the jury was illegally selected because the prosecutor *Page 783 
used racial considerations in excluding blacks from the jury. The record indicates that there were four blacks on the venire and that the prosecutor for the State used four of his six strikes to strike those persons. The appellant made a motion for new trial on the basis of the prosecutor's strikes and a hearing was held in order to determine whether the prosecutor had any explanations for the strikes.
The Alabama Supreme Court has determined that the decision inBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986), is to be applied retroactively. Ex parte Jackson,516 So.2d 768 (Ala. 1986). In the case sub judice, the appellant is black and, under Batson, "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Avery v.Georgia, [345 U.S. at 559, 73 S.Ct. 891, 97 L.Ed. 1244.]"Batson, 476 U.S. at 96, 106 S.Ct. at 1723. After the appellant has made a prima facie showing of discrimination against black jurors, the burden shifts to the State to produce neutral explanations for challenging the black jurors. The record indicates that the prosecution gave the following explanations for the black jurors that were struck:
 "[Prosecutor]: Okay. Well, my records indicate that we struck four — my notes indicate that our first strike was Number Fifty-Six which was a white female, secretary at Providence Hospital. Her father was a retired police officer. Our second strike was a black, Fifty-Seven, which was a young black female who was single and worked as a server at Quincy's. In that particular case I know that the fact that she was single and was young were two of the things that we considered in striking her. Plus, during the voir dire questioning, she appeared, as did several others, to be non-concerned with the proceedings, disinterested in what was going on and just appeared to be uninterested in sitting on a particular case and being a member of this jury. Our next strike I show as Number Forty-Six. That was a young black male who also was single and was unemployed, and those — the fact that he was young and single and was unemployed are factors that we considered in striking him. And if I recall correctly, they were, they were sitting together and showed — he showed the same non-interest in what was going on and appeared —
". . . .
 "[Prosecutor]: The next one I show is Number Fifty-Five. This also was a young black male who was single, and the same reasons there — unconcerned. I even recall during the questioning, looking up at the ceiling, down at the floor. You know, just total nonconcern of what was going on. The next one I show is Forty-Five. This was a white male who was married. He was unemployed. I believe he was married according to my notes. The fact that he was unemployed and we felt he would not make a good juror in this particular case. And our last strike was Fifty-Four, and according to my notes that was a black female that was marked and she was a teacher and that was the reason we struck her, the fact that she was a teacher and I know I strike all teachers. In all cases. So, that's — that was primarily the reasons that we struck those six individuals. We felt that they would just not make good jurors in this particular case."
Thus, the prosecutor produced race-neutral explanations for his strikes.
 " 'The reasons given in response to the court's inquiry need not be equivalent to those for a challenge for cause. If the party shows that the challenges were based on the particular case on trial, the parties or witnesses, or characteristics of the challenged persons other than race, then the inquiry should end and the jury selection should continue.' "
Ex parte Jackson, supra, 516 So.2d 768, quoting State v. Neil,457 So.2d 481, 487 (Fla. 1984). *Page 784 
A copy of the prosecutor's venire list was admitted into evidence. The list contains the prospective juror's names and, to the left side of each name, the prosecutor has used initials to indicate the race, gender, and age group of each prospective juror. The prosecutor made further specific comments as to each juror on the right side of each name. The appellant claims that because the prosecutor considered the race of each prospective juror, he violated the Batson rule and discriminated against the appellant. During the hearing, the prosecutor indicated that although a prospective juror's race was considered for the purposes of identification, "[r]ace was not, was not a consideration in striking this jury." The prosecutor further pointed out that the victim was also a black male. While theBatson decision forbids the exclusion of a juror solely on the basis of his race, there is no prohibition against the use of an individual's race for purposes of identifying the prospective juror.
 II.
The appellant contends that the State withheld exculpatory information from him. He specifically argues that the grand jury testimony of Dale Gamble explaining how the appellant obtained the gun was withheld. Gamble testified at trial that he had first seen the gun lying on a street in Mobile and that he kept the gun until the appellant and he reached Whistler Avenue, whereupon he gave the gun to the appellant. In his statements to the grand jury, Gamble indicated that he did not know that the appellant was carrying a gun. The appellant argues that he was prejudiced by the suppression of the grand jury testimony, because that testimony would have "further impeached the credibility of Gamble's trial testimony."
The defense counsel made a motion to produce the grand jury testimony prior to trial, stating that Gamble gave him three different statements at the scene of the alleged murder, and that he gave a statement to the police which the district attorney showed to the defense counsel. The defense counsel further stated that "he's [Gamble has] testified two times to the Grand Jury, and these statements are not consistent. . . . What I think is the Grand Jury testimony might be inconsistent too, and I think that's exculpatory for the defendant." The prosecution explained that the reason that Gamble testified twice before the grand jury was because the first hearing was continued because another witness was unable to attend the initial grand jury. Further, the prosecutor stated that he had heard both testimonies and that they were basically the same. The trial court, however, ordered that the testimony be transcribed so that he could decide whether it containedBrady material. The trial judge thereafter denied the appellant's motion for production of the grand jury testimony, stating that he found "absolutely no Brady material in it."
In order to establish a Brady violation, the appellant must prove:
 " '(1) The prosecution's suppression of evidence; (2) the favorable character of the suppressed evidence for the defense; (3) the materiality of the suppressed evidence.' "
Monroe v. Blackburn, 607 F.2d 148, 150 (5th Cir. 1979); Knightv. State, 478 So.2d 332 (Ala.Cr.App. 1985). "A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that suppressed evidence might have affected the outcome of the trial." United States v. Agurs,427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The United States Supreme Court has held that impeachment evidence, as well as exculpatory evidence, falls within the Brady rule.United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375,87 L.Ed.2d 481 (1985); Giglio v. United States, 405 U.S. 150,92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule [of Brady]. . . . We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .' *Page 785 United States v. Keogh, 391 F.2d 138, 148. . . . A finding of materiality of the evidence is required under Brady. . . . A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .'
Giglio v. United States, 405 U.S. at 154, 92 S.Ct. at 766.
 " 'The evidence suppressed must have been material, probative, vital and exculpatory to the accused. A new trial is required only if the evidence undisclosed could, in any reasonable likelihood, have affected the judgment of the jury. In United States v. Agurs, [427 U.S. 97, 96 S.Ct. 2392, 40 L.Ed.2d 342 (1976)], the United States Supreme Court stated that the correct rule is that a constitutional error has occurred if the omitted evidence creates a reasonable doubt that did not otherwise exist and that the omission must be evaluated in the context of the entire record.' "
Dickerson v. State, 517 So.2d 625 (Ala.Cr.App. 1986), quoting C. Gamble, McElroy's Alabama Evidence, § 290.05(2) (3d ed. 1977).
In the case sub judice, the defense counsel admitted that he already had access to contradictory testimony of Dale Gamble, and thus was privy to sources which could be used to impeach the witness. Therefore, although we find it doubtful that the testimony was in fact exculpatory, the testimony was merely cumulative towards its purpose; the failure to disclose did not deny the appellant a fair trial, nor did the "suppression" of the testimony undermine the confidence in the outcome of the trial.
 III.
The appellant argues that the prosecutor's comment in his opening statement violated the appellant's right against self-incrimination. The following transpired during the prosecutor's opening statement:
 "[Prosecutor]: Now I anticipate as far as what we expect the defense evidence in this case to show —
 "[Defense Counsel]: Your Honor, I object on the grounds — may I approach the bench on this objection as to the comment just made by the prosecutor.
"[Bench] The Court: Yes.
 "[Defense Counsel]: Your Honor, I object to the prosecutor saying what he expects the defense evidence to be. That places a burden on the defense to present evidence. We have no burden. I move for a mistrial based on what the prosecutor said in his opening statement.
". . . .
". . . .
 "[Prosecutor]: I understand. I think we have a right to say what we expect any witness — I'm certainly not going to say anything about the defendant.
 "The Court: I'm going to limit you to what you expect any witness — how do you know he is going to call a witness?
"[Prosecutor]: I'm sorry, Judge?
"The Court: I'll leave that alone.
"[Defense Counsel]: I still move for a mistrial.
"[Resumed before jury] The Court: Denied.
 "The Court: Under the law of the State of Alabama the defendant is not under a duty to prove anything to you. The burden rests solely upon the State to prove the guilt of the defendant beyond all reasonable doubt and to a moral certainty."
"In a case which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error there must be a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d 1231, 1234 (Ala. 1979)." Ex parte Williams, 461 So.2d 852, 854 (Ala. 1984). "[T]o constitute an improper comment on the accused's failure to testify, the prosecutor must make a direct reference to the accused's failure to take the witness stand. [Citation omitted]. There was no such reference by the State in this case." Hardy v. State, 462 So.2d 1016, 1017 (Ala.Cr.App. 1984).
 "In Cook v. State, 52 Ala. App. 159, 290 So.2d 228
(1974), . . . the court held that *Page 786 
the prosecutor's comment was merely an incident of trial which was not intended, and could not have been construed by the jury, as a comment on the appellant's failure to testify. Rather, it was intended as argument on the admissibility of other evidence. The court noted additionally that, just as in the instant case, the appellant had not failed to testify at the time the comment was made, and that the appellant did in fact subsequently testify."
Id. While a prosecutor may properly explain to the jury what he expects the evidence to show in his opening statement, Renfroev. State, 382 So.2d 627, 630 (Ala.Cr.App.), cert. denied,382 So.2d 632 (Ala. 1980), he may not make any implication that leads the jury to believe that the appellant must produce certain evidence, or in any way shifts the State's burden of proof to the appellant.
 "The purpose of an opening statement is merely to advise a jury of the issues involved in the case before them. Braswell v. State, Ala.Cr.App., 371 So.2d 992 (1979). It is a well-established rule that the scope and latitude of the opening statement are matters that rest within the sound discretion of the trial judge and his ruling should not be disturbed on appeal unless an abuse is shown. Winnings v. State, Ala.Cr.App., 370 So.2d 323, cert. denied, Ala., 370 So.2d 329 (1979)."
Brown v. State, 401 So.2d 213, 216 (Ala.Cr.App.), cert. denied,401 So.2d 218 (Ala. 1981).
In the case sub judice, the trial court sustained the defense counsel's objection and immediately instructed the jury that the burden of proof as to the defendant's guilt rests solely with the State and, thus, cured any error that might have resulted from the prosecutor's statement. Cf. Brown v. State,supra, (wherein the prosecutor stated in his opening statement that he expected the judge to charge "that criminally negligent homicide is also a defense"; although this court acknowledged that the prediction was premature, as no evidence had yet been presented to the jury and the prosecutor's reference to "criminally negligent homicide" as a "defense" was incorrect, the trial judge cured the error by sustaining the defense counsel's objection); McGuire v. State, 401 So.2d 142
(Ala.Cr.App.), cert. denied, 401 So.2d 147 (Ala. 1981) (wherein the trial court properly sustained the defendant's objection to the statement made by the prosecutor in his opening statement which was "in the nature of argument" and inappropriate subject matter for an opening statement). Appellant's argument must fail. This cause is due to be affirmed.
AFFIRMED.
All the Judges concur.