575 So.2d 1198 (1990)
Joe Cecil DUNCAN, Jr.
v.
STATE.
2 Div. 671.
Court of Criminal Appeals of Alabama.
August 3, 1990.
Rehearing Denied November 30, 1990.
*1199 J.L. Chestnut, Jr. and Henry Pitts, Selma, for appellant.
Don Siegelman, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
McMILLAN, Judge.
The appellant was convicted of intentionally causing the death of Elizabeth Cobb, by shooting her with a firearm, while knowing that she was on duty as an Alabama State trooper, in violation of § 13A-5-40(a)(5), Code of Alabama (1975), and for pecuniary or other valuable consideration, specifically the proceeds of a life insurance policy, in violation of § 13A-5-40(a)(7), Code of Alabama (1975). Following a sentencing hearing, the jury recommended, by a vote of 10 to 2, that the appellant be sentenced to life without parole. Following a separate sentencing hearing, the trial court overrode the jury's advisory sentence and imposed the death penalty.

I
The appellant alleges that the State failed to disclose certain items of evidence, in violation of his constitutional rights. Specifically, the appellant alleges that he was entitled to a yellow legal pad that the police department used to record information received in telephone calls from the public, concerning a dark-colored Trans Am automobile, originally thought by the police to be involved in Elizabeth Cobb's murder. The appellant's theory of defense was that she was murdered by someone in the Trans Am.
The record indicates that, on October 11, 1987, Elizabeth Cobb was working on patrol as an Alabama State trooper from 2:00 p.m. until 11:00 p.m. Between 7:15 and 7:30 p.m., she was seen at the Alabama State trooper post and reported back on patrol at 7:32 p.m. Thereafter, the trooper post received no further communication from her and, when she had not reported off-duty by midnight, a radio dispatcher telephoned her residence. When no one answered Elizabeth Cobb's telephone, the dispatcher telephoned the appellant's residence, since she knew they were friends. the appellant's telephone line was busy, and a State trooper was sent to Elizabeth Cobb's residence. He determined that she was not present and then drove to the appellant's residence. The appellant informed the trooper that he had not heard from Elizabeth Cobb since approximately 7:00 p.m. A search was then begun to find Elizabeth Cobb, and her body was found the next morning at 9:38 a.m., sitting in the driver's seat of her patrol car, which was parked behind a church on a county road. Her car keys, service revolver, and traffic ticket book were missing. She had been shot three times in the head. A ballistics expert with the Department of Forensic Sciences determined that the bullets that caused her death were .22 caliber. The pathologist estimated that her death occurred between 7:00 p.m. and 9:00 p.m. on October 11, 1987.
On the night of October 12, the Alabama State trooper station received a telephone call from a truck driver who informed them that he had learned of Elizabeth Cobb's death on the news and that he had some information. He told them that he had been stopped by her on October 11 around 8:00 p.m. He stated that she "threw the blue light on me" and parked behind his truck. He got out of his truck and started walking toward her, and she approached him from her vehicle. He stated that she asked for his driver's license and that he began to reach for it. He then heard "a loud noise like glass packs on a car" and, as he and Cobb looked toward the noise, a car drove by at a high rate of speed. The truck driver stated that it was dark, but that he believed the vehicle to have been a dark-colored Trans Am with spoilers on the trunk. The truck driver informed the police that Elizabeth Cobb instructed him to remain there until she returned. She then got back in her vehicle, made a U-turn, and pursued the other vehicle. The truck driver further stated that he remained at that site for 45 minutes and that Elizabeth Cobb never returned. He indicated that he had previously seen Elizabeth Cobb "a couple of times" at a Waffle House restaurant. An investigator was sent to the truck driver's *1200 home, and a written statement was taken.
Upon investigation, the police department located a vehicle, similar to the one described by the truck driver, that had been traced to a Charlie Shoemaker, who was subsequently found in prison in Okaloosa County, Florida. A .22 caliber Ruger pistol with a silencer attached had been found in the vehicle.
After the truck driver made his statement, employees of the Alabama State trooper's office were instructed to record on a yellow legal pad any information from incoming telephone calls concerning a dark blue or black Trans Am or similar vehicle. The appellant did not learn of the existence of this yellow pad until cross-examination of a radio operator for the State trooper office. The yellow legal pad was kept near the telephone from shift to shift. One of the employees who took these calls concerning the Trans Am on each shift testified that when she took these calls she always tried to get the caller's name, telephone number, and as many details as possible concerning the vehicle. She further testified that there were five employees answering the telephone and that they were instructed to record these calls during a period of a week or two. She testified that she did not know what happened to the list, but that her supervisors had instructed her to refrain from getting any more information. When asked if any of the investigators ever called requesting information from this pad, the witness responded, "No, sir. I have called and given them some information if I thought it sounded like something that they might want to know. If it sounded interesting to me, my own personal opinion." She further testified that on occasion she called the investigators "and said we have just received this call on this certain tag or whatever or this vehicle." She testified that she would sometimes make a notation on the pad that certain of the information had been forwarded to the A.B.I. or to one of the investigators. She testified that she could not remember any of the particulars of the telephone calls or whether any of the telephone calls came from other State troopers.
During the presentation of the appellant's case, defense counsel called the A.B.I. investigator as a witness and the following transpired:
"Q: To refresh your memory, would you take a look at this? This is a transcription of one of thosethat October 16th conversation. And the question I'm putting to you, did you say this, you wouldn't believe the folks that are giving the information on this Trans Am and folks calling in saying they saw a patrol car at, you know, 6:30 and 7:00 and we're having to trace all that down. Did you say that?
"A: Yes, sir.
"Q: So it was more than the trucker who was giving you information, isn't that right?
"A: We put out a news release asking for information on the Trans Am.
"Q: And not only about the Trans Am, but about the patrol car?
"A: Correct.
"Q: What patrol car were they talking about, Sergeant?
"A: We requested telephone calls from the public regarding anybody who had seen Trooper Cobb's movements or any patrol car in Dallas County that night."
Subsequently at trial, the following transpired:
"[DEFENSE COUNSEL]: Judge, I would like to get something in the record. Yesterday we had asked for the yellow pad that was supposedly made by the radio operators that was testified to. It is our contention that this yellow pad would contain exculpatory information from which we would have been entitled to have. We want on the record that we have not been furnished with this yellow pad. I would ask you as Assistant Attorney General whether or not you have been able to locate that pad. And if so, are we going to be given a copy of that?
...
The prosecutor later responded as follows:
"[PROSECUTOR]: We would submit that the State has complied with all the *1201 discovery rules applicable to this case. In addition, we have provided the evidence to which this defendant is constitutionally entitled. And we submit that all this discovery has been provided timely as ordered and any evidence that was not provided is not covered by the rules and consists of in fact material that is excluded by the rules and expressly not discoverable by the defense.
"[DEFENSE COUNSEL]: You would have to agree with me, [PROSECUTOR], there has been evidence about this black Trans Am and evidence that the radio operators were required to keep that. Now, Your Honor, if the tag numbers match on Charlie Shoemaker's vehicle or if there is a reference to Charlie Shoemaker's vehicle, that would be exculpatory.
"THE COURT: I think your record is in good shape so far as your position is concerned; and I think my ruling is clear as I can make it. And if there is a problem, it will be covered; but it will be at the appropriate time and I don't think this is the time.
"[DEFENSE COUNSEL]: I just wanted to get it in the record that we would be entitled to it.
"[PROSECUTOR]: And we submit they are not."
The appellant never admitted shooting the victim. He eventually gave a statement in which he admitted finding her body after she had been shot and, out of fear, fleeing from the scene. His theory of defense was that someone in the dark-colored Trans Am committed the murder.
The State's evidence was entirely circumstantial. There were no eyewitnesses. The murder weapon was never found. Although tire prints were found at the murder scene, they did not match the tires on the appellant's trooper vehicle or on his private automobile. Footprints were found at the scene and compared with the tennis shoes that were found at the appellant's residence; they did not match. Elizabeth Cobb's trooper vehicle was processed for latent fingerprints, and four removed from the passenger's door were determined to have been the appellant's. The appellant's fingerprints were also found on some of the paperwork in the vehicle. No fingerprints made by Elizabeth Cobb were found on that paperwork. Moreover, a number of identifiable prints were found inside her vehicle that were determined not to match those of the appellant. The appellant and the victim were engaged to be married. The State presented evidence that the appellant had a large amount of debt and had taken out an insurance policy on the victim, naming him as beneficiary. The policy had a basic benefit of $250,000 with an additional $100,000 accidental death benefit. An identical policy was taken out by the appellant on his life naming the victim as the beneficiary. The State also presented testimony implying that the appellant was not serious about his relationship with the victim, despite their engagement. The State also presented testimony that, on the night of the murder, the appellant was playing cards with two fellow employees, who were females, and when asked by one if Elizabeth Cobb would be angry to find them at his home, he responded that she would not drive by because he had told her that his ex-wife would be present. The fellow employee then asked how he knew she would not drive by, and the appellant responded, "She won't." The State also presented evidence that the appellant had originally denied any knowledge of the victim's murder and subsequently had admitted that he had found her, but had fled in fear. The State also presented expert testimony to refute the appellant's statement that, upon finding the victim's body, he smelled gun powder, became afraid, and fled. The State's expert testified that the aroma of gun powder does not last beyond a minute or two and, therefore, that the appellant would have seen the individual who shot the victim at close range.
We conclude that the appellant's constitutional rights were violated by the prosecution's failure to disclose the yellow legal pad, especially in light of the appellant's theory of defense and the circumstantial nature of the State's case. In Ex parte Monk, 557 So.2d 832 (Ala.1989), the *1202 district attorney objected to a trial court's discovery order because, among other reasons, "it required turning over material in the possession of any investigative agency though not in possession of the district attorney's office itself. ... He questioned only whether the capital murder nature of a case constituted an adequate reason for so ordering." Id. The Alabama Supreme Court addressed the question of "whether capital cases by their very nature are sufficiently different from other cases to justify the exercise of judicial authority to order discovery from the prosecution as broad as that contained in" the discovery order of that case. 557 So.2d at 836. The Court answered the question affirmatively. "`When the penalty is death, we, like state court judges, are tempted to strain the evidence and even, in close cases, the law in order to give a doubtfully condemned man another chance.' Furman v. Georgia, 408 U.S. 238, 287, 92 S.Ct. 2726, 2751, 33 L.Ed.2d 346 (1972). The hovering death penalty is the special circumstance justifying broader discovery in capital cases." 557 So.2d at 837. The Alabama Supreme Court noted, by footnote, the large number of Alabama capital cases which have been reversed on collateral attack for violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
In Ex parte Kimberly, 463 So.2d 1109, 1111 (Ala.1984), the Alabama Supreme Court quoted this court's statement of applicable law, when an appellant claims a Brady violation because of a prosecutor's suppression of evidence that another individual might have committed the offense:

"`Brady held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87 [83 S.Ct. at 1196-1197]. "A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." United States v. Agurs, 427 U.S. 97, 104 [96 S.Ct. 2392, 2398, 49 L.Ed.2d 342] (1976).
"`When the prosecutor fails to disclose evidence specifically requested by the defendant a new trial should be granted if the disclosure "might have affected the outcome of the trial." Agurs, 427 U.S. at 104 [96 S.Ct. at 2398]. In Ex parte Watkins, 450 So.2d 163 (Ala.1984), our Supreme Court stated:
"`"Regardless of its admissibility or its trustworthiness, however, the crucial question is the significance of the suppressed information upon the question of Watkins' guilt or innocence. Agurs, 427 U.S. at 112, n. 20 [96 S.Ct. at 2401, n. 20]. The Supreme Court, in Agurs, instructed:
"`"`[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" 427 U.S. at 112-13 [96 S.Ct. at 2401-02].
"`"On its face, there can be no question that this evidence, if the defendant can prove its truthfulness, would create a reasonable doubt as to the guilt or innocence of the accused, because it identifies other individuals as those who committed the robbery."'
"`A new trial should not be granted simply because the prosecutor has failed to disclose evidence which the trial court ordered produced without a consideration of the materiality of the evidence and the effect of the evidence on the outcome of the defendant's trial. "The principle of Mooney v. Holohan [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." Brady, 373 U.S. at 87 [83 S.Ct. at 1197].'"
In reversing this court, the Alabama Supreme Court noted the difference in determining whether there has been a Brady *1203 violation when a specific request for information has been made:
"`In Brady the request was specific. It gave the prosecutor notice of exactly what the defense desired. Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.'"

Ex parte Kimberly, 463 So.2d at 1112, quoting Agurs, 427 U.S. at 106, 96 S.Ct. at 2399. (Emphasis added.)
The Alabama Supreme Court acknowledged that, where the requested material might have proved that someone else committed the offense, the information was both exculpatory and material:
"In [Ex parte] Watkins, [509 So.2d 1064 (Ala.1984)], this Court held that evidence indicating that other individuals may have committed the robbery with which defendant was charged, if proved, could create a reasonable doubt as to defendant's guilt. Therefore, the Court concluded that justice required disclosure of that evidence. We perceive the present situation to be, in principle, indistinguishable from Watkins. Here, there was a specific request for exculpatory evidence learned by law enforcement officers; the officers learned of the exculpatory evidence but failed to disclose it. Regardless of its reliability, there can be no doubt that the evidence provided by Whatley, if believed by the jury, would have had an effect on the trial by exculpating Kimberly. Consequently, that evidence was material within the meaning of Brady, Agurs, and Watkins, and should have been revealed."
463 So.2d at 1112-13. See also Patton v. State, 530 So.2d 886 (Ala.Cr.App.1988) (wherein this court held that the prosecutor's failure to inform the defendant of an anonymous telephone call informing the police that someone other than the defendant was responsible for the shooting violated the defendant's constitutional rights, regardless of the admissibility of the telephone call at trial.)
In the present case, the appellant specifically requested the yellow legal pad. Whether the prosecutor knew of the existence of the pad, the knowledge of the law enforcement agents is imputed to the prosecutor. See Patton, supra, at 889; Fulford v. Maggio, 692 F.2d 354, 358 (5th Cir.1982), reversed on other grounds, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). The information contained in the yellow legal pad was never disclosed to the appellant or to defense counsel; thus the evidence was suppressed. Patton, supra. Moreover, as stated in Agurs, supra, and quoted in Ex parte Kimberly, supra, "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."
Because the yellow legal pad was never produced, the trial court never had an opportunity to determine the exculpatory nature of the information. Clearly, if the information contained on the pad was specific enough to indicate that someone else may have committed the offense, that information would be favorable to the appellant. Ex parte Kimberly, supra. The radio dispatcher's testimony that, on occasion, she telephoned her superiors to inform them of certain information, which she had received and had recorded on the yellow legal pad, that she felt to be important, could indicate that the pad contained exculpatory material. However, the trial court could best make that determination.
As to the materiality of the yellow legal pad, clearly if the pad contained information, which, if proved, would indicate that someone else had committed the offense, that information would be material to the appellant's guilt. United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
Therefore, this cause is due to be remanded to the trial court to determine *1204 whether the yellow legal pad exists. If the trial court determines that the yellow legal pad no longer exists, then this information cannot be classified as exculpatory, but rather "potentially useful" to the appellant. Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Therefore, the trial court must examine the police department's conduct resulting in the legal pad's disappearance. If the police department disposed of the pad, even if it was based upon the belief that the pad contained nothing exculpatory, then the appellant is entitled to a new trial pursuant to Ex parte Dickerson, 517 So.2d 628 (Ala. 1987). If the trial court determines that the yellow legal pad disappeared as a result of negligence, with no indication of bad faith, then there has been no violation of the appellant's rights to due process, and he is therefore not entitled to a new trial. Arizona v. Youngblood, supra.
In Ex parte Dickerson, supra, a video tape recording had been made at the scene of the appellant's alleged possession of a pistol. The police testified that the recording depicted the police officers' approach, and one officer stated that it then showed the defendant being held by a police officer. Subsequently the tape, according to one officer, "just showed sky and rocks." 517 So.2d at 630. The police determined that the videotape contained nothing of importance to the case and nothing favorable to the defendant and, therefore, erased the tape. In holding that the defendant was entitled to a new trial because his constitutional rights to due process were violated, the Alabama Supreme Court stated:
"It is not in the interest of justice to permit the prosecution, in its unfettered discretion, to determine the favorable or unfavorable nature of potentially exculpatory evidence, and then allow the prosecution to destroy the evidence, thereby forcing the defendant to establish the favorable nature of evidence that no longer exists. In the present case, since the prosecution was attempting to establish constructive possession of the pistol, the videotape would have been favorable to the defendant if it showed that the defendant was away from the car and that the car door was closed. Through inconsistent statements, the police officers attempted to establish that the videotape was not favorable to the defendant because the tape depicted only a portion of the arrest scene. Additionally, the prosecution summarized that the videotape was immaterial because several officers had testified as to the same evidence that would have been depicted by the videotape.
"The fact remains that the police officers intentionally destroyed the videotape after making their own determination as to its favorable or unfavorable nature. This act substantially impaired the defendant's ability to establish the favorable nature of the evidence and violated the defendant's right to due process."
517 So.2d at 630-631. Thus, if the trial court determines that the police or the State disposed of or destroyed the yellow legal pad, even if they did so in the belief that the pad contained nothing exculpatory, the appellant's rights to due process were violated, and he is entitled to a new trial.
According to Arizona v. Youngblood, supra, the failure to preserve evidence potentially useful to a defendant does not violate the defendant's right to due process, unless the defendant can show that the State acted in bad faith in failing to preserve the evidence. The defendant in Arizona v. Youngblood was convicted of child molestation, sexual assault, and kidnapping. The victim subsequently identified the defendant as his assailant in a photographic lineup. A "sexual assault kit" was used to collect evidence, and the victim's clothes, which contained semen stains, were collected. The police, however, failed to refrigerate the victim's clothes so that the results from tests subsequently performed on the clothing were inconclusive. The defendant submitted that, if the clothing had been properly preserved, the semen samples might have exonerated him. The United States Supreme Court held that, because the destroyed evidence was not definitely exculpatory, but rather "potentially useful," the defendant *1205 must also show bad faith on the part of the police. The Court stated:
"We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly requires it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.
"In this case, the police collected the rectal swab and clothing on the night of the crime; respondent was not taken into custody until six weeks later. The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent. None of this information was concealed from respondent at trial, and the evidencesuch as it waswas made available to respondent's expert who declined to perform any tests on the samples. The Arizona Court of Appeals noted in its opinionand we agreethat there was no suggestion of bad faith on the part of the police. It follows, therefore, from what we have said, that there was no violation of the due process clause."
488 U.S. at 57-58, 109 S.Ct. at 337. Thus, the United States Supreme Court has suggested certain guidelines for determining whether the State acted in bad faith. If the trial judge finds that the yellow legal pad was lost, he must determine whether the State acted in bad faith as to the pad's disappearance.
For the reasons stated above, this cause is remanded to the trial court for a determination as to whether the yellow legal pad exists. If the pad exists, the trial judge is ordered to determine whether the information that it contains regarding the dark-colored Trans Am is exculpatory. If the trial court finds that it is, then the appellant's rights to due process have been violated by the State's failure to produce the pad and he is entitled to a new trial. If the trial judge determines that the information is not exculpatory, the trial judge is ordered to return his findings of fact, along with the yellow legal pad, to this court. If the trial judge determines that the yellow legal pad no longer exists, he is ordered to conduct a hearing to determine whether its disappearance is due to a unilateral decision by the State, which determination would mandate a new trial for the appellant, or whether the State acted out of negligence, with no showing of bad faith, in which case the appellant would not be entitled to a new trial. In either case, the trial judge is ordered to return a transcript of the hearing, with his findings of fact and conclusions of law, to this court.

II
The appellant argues that, through the use of peremptory challenges to remove blacks from the jury, the prosecutor violated his rights under the Sixth, Eighth, and Fourteenth Amendments, as well as under Alabama law, citing Ex parte Branch, 526 So.2d 609 (Ala.1987), and Ex parte Jackson, 516 So.2d 768 (Ala.1986). Although the appellant cites the Eighth Amendment prohibition against cruel and unusual punishment as a ground for asserting the violation of his rights, he cites no authority to explain how the prosecution's use of its peremptory challenges violates his rights to be protected from cruel and unusual punishment. As this court has likewise found no such authority, we will not discuss this ground.
The appellant argues that his Sixth Amendment right to a jury composed of a fair cross section of the community was violated by the prosecution's use of 25 of its 29 peremptory challenges to remove blacks from the jury. The appellant in the instant case is white. In Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), the United States Supreme Court examined a white defendant's standing to raise a Sixth Amendment challenge to the prosecution's use of peremptory *1206 challenges to exclude blacks from the jury, and whether those strikes would violate the defendant's Sixth Amendment right to a trial by an impartial jury. The Court concluded that, under the Sixth Amendment, every defendant is entitled to object to a venire that does not represent a fair cross section of the community. Therefore, a white defendant has standing to raise a Sixth Amendment challenge to the exclusion of blacks from his or her jury. However, the Court also determined that the fair cross section requirement does not prohibit peremptory challenges. "The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a representative jury (which the Constitution does not demand), but an impartial one (which it does)." 110 S.Ct. at 807 (Emphasis in original.)
"The rule we announce today is not only the only plausible reading of the text of the Sixth Amendment, but we think it best furthers the Amendment's central purpose as well. Although the constitutional guarantee runs only to the individual and not to the State, the goal it expresses is jury impartiality with respect to both contestants: neither the defendant nor the State should be favored. This goal, it seems to us, would positively be obstructed by a petit jury cross section requirement which, as we have described, would cripple the device of peremptory challenge. We have acknowledged that that device occupies `an important position in our trial procedures,' Batson [v. Kentucky, 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986)], 106 S.Ct., at 1724, and has indeed been considered `a necessary part of trial by jury,' Swain v. Alabama, [380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965)], 85 S.Ct., at 835. Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of `eliminat[ing] extremes of partiality on both sides,' ibid., thereby `assuring the selection of a qualified and unbiased jury,' Batson, supra, 476 U.S., at 91, 106 S.Ct. at 1720."
110 S.Ct. at 809. (Emphasis added in Holland.)
While acknowledging that the Sixth Amendment is not the proper avenue for raising a claim concerning a violation of a defendant's rights by the systematic exclusion of blacks from the jury, the Court does not preclude such a claim from being made or quash its importance. Rather, the Court acknowledges that such claims should be raised under the auspices of the Equal Protection Clause.
"We do not hold that the systematic exclusion of blacks from the jury system through peremptory challenges is lawful; it obviously is not, see Batson, supra. We do not even hold that the exclusion of blacks through peremptory challenges in this particular trial was lawful. Nor do we even hold that this particular (white) defendant does not have a valid constitutional challenge to such racial exclusion. All we hold is that he does not have a valid constitutional challenge based on the Sixth Amendmentwhich no more forbids the prosecutor to strike jurors on the basis of race than it forbids him to strike them on the basis of innumerable other generalized characteristics."
110 S.Ct. at 803. (Emphasis in original.)
Thus, the appellant's claim raised under the Sixth Amendment must fail. However, because the United States Supreme Court has not yet determined a white defendant's standing to raise this claim under the Equal Protection Clause, but has left open such a possibility,[1] this court will examine the appellant's claim under the guidelines set forth in Batson v. *1207 Kentucky, supra, and Ex parte Branch, supra.
The record indicates in the present case that the jury was struck after extensive voir dire. Prior to the jury's being sworn and empaneled, the following discussion took place:
"DEFENSE COUNSEL: Judge, I do want to put one thing in the record. The defendant comes and shows that of 29 strikes, the State of Alabama systematically struck blacks except in four instances, and that these blacks were stricken because they are black. And we would like to put in the record the actual strikes by the State and we move the Court that that denies to Mr. Duncan a trial by a random cross-section of his peers in this country without regard to racial discrimination in violation of both the Alabama and federal constitutions. That's all I have, Your Honor.
"THE COURT: Anything from the State?
"[PROSECUTOR]: Yes, Your Honor, by virtue of the issue joined by [defense counsel] in his motion for the record, we would submit to the Court that those veniremen referenced by [defense counsel] in his submission to the Court were stricken on racially-neutral grounds separately and severally and not as he submitted solely on the basis of their race, nor was that a material contributory factor in their selection for striking by the State."
No reasons were given by the prosecutor for his individual strikes against the black veniremembers.
Therefore, if upon remand, the trial court determines that the appellant is not entitled to a new trial for the reasons discussed in Issue I, and despite the fact that it has not yet been held that the appellant would have standing to raise this claim under the Equal Protection Clause, out of an abundance of caution because this case involves the death penalty, this cause is remanded to the trial court with instructions that a hearing be held in which the prosecutor must come forward with racially-neutral reasons for his peremptory strikes of black veniremembers. Following the hearing, the trial court should file a return to this court, including a transcript of that hearing and the trial court's finding of fact and conclusions of law. If the appellant is entitled to a new trial pursuant to the discussion in Issue I, then these instructions regarding Issue II are moot.
REMANDED WITH INSTRUCTIONS.
TAYLOR, P.J., concurs.
TYSON, J., concurs in Part I and concurs in result only in Part II without opinion.
BOWEN, J., concurs in Part I and concurs in result only in Part II with opinion.
PATTERSON, J., concurs in Part I and dissents in Part II with opinion.
BOWEN, Judge, concurring specially.
I concur in Part I of the majority opinion. I concur only in the result of Part II. I continue to adhere to the principle expressed in my dissent in Gordon v. State, [Ms. 8 Div. 496, May 25, 1990] (Ala.Cr.App. 1990), that a white defendant has standing to raise a "Batson " objection. I see no plausible reason for this Court to await "direction" from any other court on this issue. The Alabama Supreme Court has not shown such a reluctance in recognizing that certain rights are guaranteed under our own state constitution. Ex parte Jackson, 516 So.2d 768, 772 (Ala.1986). See also Thomas v. Diversified Contractors, Inc., 551 So.2d 343 (Ala.1989).
"[I]t is well-recognized that rights under state constitutions, including rights very similar to those protected by the federal constitution, are sometimes regarded as being more extensive than their federal counterparts." Ex parte Caffie, 516 So.2d 831, 837 (Ala.1987).
It is my belief that Batson is directed against the evil of racial discrimination in the selection of the trial jury without regard to the race of the defendant.
Furthermore, the majority, in fact, recognizes the correctness of this principle "in an abundance of caution" by remanding *1208 this cause for a Batson hearing despite the fact that Duncan is white.
PATTERSON, Judge (concurring in part; dissenting in part).
I concur in Part I of the opinion; however, I dissent as to Part II. Remanding the case for a Batson hearing is inappropriate under the present state of the law. In addition, the majority directs the trial court to conduct a Batson hearing even though there has been no finding by the trial court that appellant made out a prima facie case of discrimination. This is contrary to the holding of Batson.
NOTES
[1] See also Justice Kennedy's concurring opinion ("I find it essential to make clear that if the claim here were based on the Eighteenth Amendment Equal Protection Clause, it would have merit") and Justice Marshall's dissenting opinion (in which he acknowledges that this question has not yet been decided, but notes that for the reader who seeks guidance on how the Court would rule if the issue were presented and argued, the agreement of five Justices that a defendant's race is irrelevant to the Fourteenth Amendment standing inquiry is far more illuminating than the majority's veiled intimations and cryptic turns of phrase."